2004 UT App 39

**STATE of Utah, in the interest of A.H., S.H., and A.H., persons under eighteen years of age.**

**T.H., Appellant,**

v.

**State of Utah, Appellee.**

**No. 20030160–CA.**

Court of Appeals of Utah.

Feb. 20, 2004.

Philip J. Danielson and Jose Silva, Provo, for Appellant.

Mark L. Shurtleff and John M. Peterson, Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before BILLINGS, P.J., BENCH, Associate P.J., and GREENWOOD, J.

## OPINION

GREENWOOD, Judge:

¶ 1 T.H., an out-of-state, non-custodial father of three children, appeals the juvenile court's order terminating his parental rights. T.H. argues that this court should reverse the juvenile court's termination order because (1) the Division of Child and Family Services (DCFS) failed to serve him with notice of earlier proceedings involving the children's removal from their mother's home and subsequent custody arrangements; and (2) the juvenile court's conclusion that he abandoned his children was not sufficiently supported by the court's findings of fact. We reverse.

## BACKGROUND [1]

¶ 2 T.H. is the natural father of three girls: A.H., born January 30, 1998, and S.H. and A.H., twins born February 22, 1999. In April 2000, T.H. and S.W., the children's mother, separated. T.H. moved out of the home and a few months later moved to the Las Vegas, Nevada area. T.H. next saw his children in December 2000, when he and his father visited Utah for Christmas. In February 2001, the Utah Office of Recovery Services (ORS) opened a child support case involving T.H. A notice of the ORS hearing was served on T.H.'s brother at T.H.'s mother's address in Nevada. Without any response from T.H., an order to pay child support was issued in April 2001. This order was mailed to T.H.'s mother's address.

¶ 3 On April 8, 2001, DCFS removed the three children from their home after their mother, S.W., attempted suicide. A shelter hearing was held on April 16, 2001. The court concluded that the children were neglected by their mother and ordered them into the custody of DCFS, which placed them

---

1. This case involves detailed facts and dates. "Because the termination of parental rights is fact sensitive, we review the facts of the contro-versy in detail." *In re M.L.,* 965 P.2d 551, 553 n. 1 (Utah Ct.App.1998) (quotations and citations omitted).

with their maternal grandmother. It is uncontested that at this time, T.H. was neither informed of the children's removal, nor was he served with notice of the shelter hearing. In late April or early May 2001, the children traveled to Nevada and stayed for about two weeks with their maternal great-aunt, who knew they were in the custody of DCFS. During this time, T.H. visited the children regularly and allegedly discussed their welfare with the great-aunt.

¶ 4 According to trial testimony, during May and June of 2001, a DCFS worker tried approximately five times to contact T.H. by telephone in Nevada to discuss his children. The worker was unsuccessful in reaching anyone at this number and was unable to leave messages. By this time, according to testimony by a DCFS caseworker, T.H. had learned from the children's mother as well as their maternal grandmother that the children had been taken from S.W.'s home and were in the custody of DCFS. On July 18, 2001, A.H., the oldest girl, was placed in the home of her half-brother's mother and father, A.C. and R.C. A.C. testified that in August, she contacted T.H. and told him A.H. was living with her. She testified that she told T.H. how he could contact her as well as the DCFS caseworker. She also testified that she called T.H. numerous times to tell him about a review hearing scheduled for August 28, 2001, and offered to drive to Nevada and bring him back to Utah for the hearing. T.H. declined the offer and did not attend the hearing. T.H. was not served by DCFS with notice of the August review hearing. After the hearing, T.H. reportedly learned that the juvenile court had transferred custody of the twins to foster parents and that A.H. remained with A.C.

¶ 5 A new DCFS caseworker testified that in October 2001, she attempted four times in one week to contact T.H. by telephone. Each time the caseworker spoke with a woman who said that T.H. lived there but was not home. Each time, the caseworker left her phone number and messages that the children were in DCFS custody and that she needed to speak with T.H. It was never confirmed whether T.H. actually received the messages or knew of the phone calls.

¶ 6 The children's maternal great-aunt testified that in December 2001, she told T.H. of a permanency hearing scheduled for January 30, 2002. DCFS again failed to serve T.H. with notice of the permanency hearing. Rather than attending the hearing, T.H. sent his father on his behalf. At this hearing, the court ordered that the children remain in the custody of DCFS and terminated reunification services for the mother. No action was taken regarding T.H.

¶ 7 In March 2002, DCFS filed a petition for the termination of both S.W. and T.H.'s parental rights. Once again, the petition was not served on T.H., and he was not given notice of the pre-trial hearing scheduled for March 16, 2002. After learning of the petition and hearing from relatives, T.H. voluntarily came to Utah and appeared at the pretrial hearing. At the hearing, T.H. was personally served by DCFS with a copy of the petition and was given notice of the trial date. A trial was held in May 2002, resulting in an order terminating the parental rights of both T.H. and S.W. The termination order as it relates to T.H. was later set aside and a new trial granted. A second trial was held on November 7 and 27, 2002. T.H. attended the trial and was represented by counsel. On January 17, 2003, the juvenile court issued findings of fact and conclusions of law terminating the parental rights of T.H. on two grounds: abandonment and making only token efforts to support, communicate, prevent neglect and/or to avoid being unfit. T.H. appeals that termination order.

ISSUE AND STANDARD OF REVIEW

■ ¶ 8 T.H. argues that the juvenile court improperly terminated his parental rights because he did not receive notice, as required by law, of earlier proceedings involving his children's removal from their mother and subsequent custody by the State. "Whether a parent has been afforded adequate due process is a question of law, reviewed for correctness." *In re J.B.*, 2002 UT App 268, ¶ 7, 53 P.3d 968.[2]

2. T.H. also challenges the juvenile court's findings and conclusion that he abandoned his chil-

## ANALYSIS

### I. Father's Notice of Prior Proceedings

█ ¶ 9 T.H. argues that the juvenile court's termination of his parental rights should be set aside because DCFS failed to serve him with notice of various proceedings related to the removal of his children from the mother's home.

### A. Parental Due Process

█ ¶ 10 It is widely recognized that "[a] parent has a fundamental right, protected by the Constitution, to sustain his relationship with his child." *In re J.P.*, 648 P.2d 1364, 1372 (Utah 1982) (quotations and citation omitted); *see also Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (recognizing the relationship between parent and child as constitutionally protected). This "freedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Quilloin*, 434 U.S. at 255, 98 S.Ct. at 555 (alteration in original) (quotations and citation omitted); *see also In re S.A.*, 2001 UT App 307, ¶ 12, 37 P.3d 1166 (recognizing parents' interest in the care, custody, and control of their children as a fundamental liberty interest protected by the Fourteenth Amendment). Therefore, we must ensure that " 'the custody, care and nurture of the child reside first in the parents.' " *In re J.P.*, 648 P.2d at 1372 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)).

█ ¶ 11 The United States Constitution guarantees that this parental liberty interest cannot be disturbed without due process of law. *See Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923). Thus, "[p]arties to a judicial proceeding are entitled to notice 'that a particular issue is being considered by a court' and must be given 'an opportunity to present evidence and argument on that issue before decision.' " *In re K.M.*, 965 P.2d 576, 579 (Utah Ct.App.1998) (citation omitted). Sufficient notice will "advise the parties of the

specific issues which they must prepare to meet." *Id.* Parties are deprived of due process when they are not properly informed of the nature of a proceeding, or notice is not given sufficiently in advance to allow preparation. *See id.*

¶ 12 Judicial and administrative proceedings following the State's removal of children from their home are no exception to this fundamental principle. Utah law governing the removal of children, their placement, and the adjudication of parental rights includes clear requirements that the State serve the necessary parties, including noncustodial parents, with notice of the proceedings, and provide them with an opportunity to appear and assert their interests. Utah Code Annotated section 62A–4a–202.2(1) (Supp.2002) specifically requires DCFS, after taking a child into protective custody, to "immediately use reasonable efforts to locate and inform, through the most efficient means available, the parents, including a noncustodial parent," (i) that the child has been removed, (ii) of the reasons for the removal, (iii) by providing a written statement explaining their procedural rights throughout the process, and (iv) by including a telephone number where they may access further information. The State is also required to give similar notice to both parents prior to shelter hearings, *see id.* § 78–3a–306(2) (2002), adjudication hearings, *see id.* § 78–3a–309 (2002), and any other proceeding related to the children's welfare. *See id.* § 78–3a–314 (2002).

### B. Service of Noncustodial Parent Under Rule 4 of the Utah Rules of Civil Procedure

¶ 13 In addition to the clear statutory requirements, T.H. argues that DCFS was bound by, but failed to follow, the notice requirements outlined in rule 4 of the Utah Rules of Civil Procedure. We agree.

¶ 14 Utah Code Annotated section 78–3a–304.5 (2002) states that the Utah Rules of Civil Procedure and the Utah Rules of Juvenile Procedure apply to "abuse, neglect, and dependency proceedings." *See also id.* § 78–

---

dren. Because of this court's disposition of the due process issue, it is unnecessary for us to

review the sufficiency of the juvenile court's findings and conclusion.

3a–406(3) (2002) (applying rules of civil procedure to parental termination proceedings). The Utah Rules of Juvenile Procedure governing petitions in neglect, abuse, dependency, and termination proceedings likewise incorporate the service requirements of rule 4 of the Utah Rules of Civil Procedure. *See* Utah R. Juv. P. 18(b)(1).[3]

¶ 15 Neither DCFS nor the Guardian ad Litem (Guardian) disputes the fact that T.H. was not formally served under rule 4 with the original removal petition or with notice of any of the later proceedings. In fact, the Guardian acknowledged that DCFS should have filed a motion and affidavit asking the court to allow alternative service on T.H. after they were unable to reach him by other means. It is unclear from the record and the briefs why DCFS chose not to pursue the option of alternative service.

¶ 16 Rule 4(c)(1) of the Utah Rules of Civil Procedure requires the summons "to be directed to the defendant." In the earlier removal and dependency proceedings, S.W., the mother, was the "opposing party" and focus of the removal petition. However, because of the nature of dependency proceedings and the statutory requirement of notifying other potentially interested parties, S.W. was not the only person entitled to service and notice under rule 4. Under Utah law, both parents, whether custodial or noncustodial, must be notified when their children are removed from their home and taken into custody by DCFS. *See* Utah Code Ann. §§ 62A–4a–202.2(1); *see also* 78–3a–306 to –310 (2002). This requirement is consistent with the constitutionally-based due process rights of parents. Therefore, we hold that even though T.H. was not the target of the original removal petition, as a noncustodial parent, he was entitled to service under rule 4(d) as if he were an opposing party. DCFS should have followed the process of personally serving T.H. with notice, and if unable to locate T.H. after a reasonable and efficient search, DCFS should have sought the court's permission for alternative service. *See* Utah R. Civ. P. 4(d) (discussing method of service).

## C. Termination of Parental Rights

¶ 17 DCFS argues, however, that while T.H. was not personally served with notice of the removal and subsequent proceedings, it was only obligated under the statute to "use reasonable efforts to locate and inform" T.H. Utah Code Ann. § 62A–4a–202.2(1) (Supp. 2002). We note, however, that there were no findings by the juvenile court, either in the earlier proceedings or in the termination proceeding, that DCFS had used reasonable efforts to locate T.H.[4] By not formally serving T.H. with notice of the multiple juvenile court proceedings involving his children's custody, DCFS deprived him of his fundamental right to be involved in his children's custody and care. *See In re J.P.*, 648 P.2d 1364, 1372 (Utah 1982).[5] The purposes of

---

**3.** Rule 4 of the Utah Rules of Civil Procedure first requires personal service of the summons and complaint on the opposing party. *See* Utah R. Civ. P. 4(d)(1). Where the identity of the party being served is unknown and cannot be ascertained through reasonable diligence, the party seeking service may file a motion and affidavit for an order allowing alternative service by publication or other means established by the court. Utah R. Civ. P. 4(d)(4)(A)-(C); *see also Bonneville Billing v. Whatley*, 949 P.2d 768, 772–73 (Utah Ct.App.1997).

**4.** We further note that DCFS failed to use various available options to locate T.H. For example, when reasonable efforts to locate the noncustodial parent have failed, Utah law requires DCFS to "search for the noncustodial parent through the national parent locator database." Utah Code Ann. § 62A–4a–202.2 (Supp.2002). There is no evidence in the record that DCFS searched for T.H. using this database. Next, the record reflects that DCFS was in frequent contact with

S.W., her family, and foster parents who all knew T.H.'s location. Yet, other than a few phone calls by DCFS caseworkers, there were no other efforts made to locate T.H. in Nevada. Finally, as previously noted, DCFS chose not to ask the juvenile court if T.H. could be served by publication or other alternative means. *See* Utah R. Civ. P. 4(d)(4)(B).

**5.** This court recognizes that the juvenile code requires DCFS to "immediately use reasonable efforts to locate and inform, through the most efficient means available, the parents, including a noncustodial parent." Utah Code Ann. § 62A–4a–202.2(1) (Supp.2002). Our opinion does not supplant this requirement for immediate, practicality-based efforts to contact a parent, given the short and strict timeliness in child welfare cases. In fact, we hope and believe that emphasis is given in shelter hearings and subsequent proceedings to probe efforts made to contact noncustodial parents. These laudable efforts,

locating and notifying noncustodial parents are to inform them of the removal of the children, to provide them with information about whom to contact regarding the children, and most importantly, to give them an opportunity to appear before the juvenile court and assert their own parental rights. *See* Utah Code Ann. § 78–3a–306 (2002).[6]

¶ 18 DCFS and the Guardian also argue that T.H. had actual notice of the removal and judicial proceedings and chose not to attend and assert his parental rights. They point to evidence that T.H. was told of certain hearings by S.W. and her family, as well as by others. Further, they refer to messages purportedly left at T.H.'s home by the DCFS caseworker. However, the record is unclear about the precise content and reliability of the communications between T.H. and S.W. and her family. Similarly, it is unclear if any of these communications included the information required by section 62A–4a–202.2(1). It is clear, however, that whatever information T.H. did receive was insufficient to inform him of what was actually occurring with his children, and to explain his rights as their father.

■ ¶ 19 In addition, there is no evidence in the record that the messages left by the DCFS caseworker were ever relayed to T.H. It is troubling that while the caseworker repeatedly called and left messages at what she believed to be T.H.'s home, there is nothing in the record to indicate she made any effort to locate an address where proper notice could be served or mailed. It is likewise troubling that while ORS had an address for T.H.'s mother in Nevada, and had served a notice of child support at that address, DCFS apparently made no effort to contact ORS and obtain that information. *See In re J.M.*, 940 P.2d 527, 538–39 (Utah Ct.

App.1997) (Davis, J., dissenting) (criticizing the failure of DCFS and ORS to communicate about the location of a noncustodial father). Sporadic contact by family members, and a few phone calls by DCFS do not constitute sufficient notice under the law. "[W]here notice is ambiguous or inadequate to inform a party of the nature of the proceedings against him or not given sufficiently in advance of the proceeding to permit preparation, a party is deprived of due process." *In re K.M.*, 965 P.2d 576, 579 (Utah Ct.App. 1998) (alteration in original) (quotations and citations omitted). Finally, any actual notice of the juvenile court proceedings received by T.H. does not excuse DCFS from its obligation to provide formal notice, nor does it vitiate the effect of the lack of formal notification.

¶ 20 We can only speculate about what T.H. would have done if he had received proper notice at or close to the time his children were removed from their mother. There should not be, however, any question that when children are removed from the home of one parent, the first and most focused effort by DCFS should be to locate and formally notify the noncustodial parent. This initial notice to the other natural parent is important because at the shelter hearing, the juvenile court "shall first determine whether there is another natural parent . . . with whom the child was not residing" and if that parent requests custody, "the court *shall* place the minor with that parent unless it finds that the placement would be unsafe or otherwise detrimental to the child." Utah Code Ann. § 78–3a–307(1) (emphasis added).

¶ 21 The failure of DCFS to properly notify noncustodial parents of a removal deprives them of their right to appear before the juvenile court early in the process and to protect their interests throughout. In this

---

however, do not negate or replace the obligation to comply with rule 4 of the Utah Rules of Civil Procedure, during the days, weeks, and months following removal of children from their homes.

6. DCFS and the Guardian argue that the failure to formally serve T.H. resulted only in the juvenile court's lack of personal jurisdiction over him and therefore prevented the court from entering any orders affecting T.H. DCFS further contends that since the court did not take any action against T.H. at the prior proceedings, his paren-

tal rights were not adversely affected. DCFS and the Guardian overlook the purpose of giving notice to a noncustodial parent. The statutory requirement of notifying people other than the custodial parent is not just to obtain personal jurisdiction by the court over those individuals, but also to notify them of the proceedings and afford them the opportunity to appear voluntarily and participate. *See* Utah Code Ann. § 78–3a–306 (2002).

case, T.H.'s parental rights were significantly affected by the State's lack of notice. After ordering the children removed from the mother's home, the juvenile court (1) held a shelter hearing and initially placed the children in the custody of their maternal grandmother; (2) continued to make temporary custody determinations throughout the proceedings; (3) made decisions regarding visitation with the children; (4) ordered placement of the children with foster parents; and (5) held multiple review hearings regarding the status of the children. All of these significant decisions were made by the juvenile court without hearing from the children's natural father. T.H. was thus deprived of the opportunity to fully participate in these proceedings.

¶ 22 The failure of DCFS to formally serve and inform T.H. about the earlier proceedings had a direct effect on the later termination of his parental rights. The juvenile court's findings supporting its conclusions that T.H. abandoned his children and made only token efforts, all relate to the time period after the children were placed into DCFS custody.[7] By restricting the findings to the time period after removal, the juvenile court examined only the contact and involvement by T.H. over a few months, during all of which, the children were in foster care or with other relatives. The failure by DCFS to properly serve T.H. with notice of the removal and to inform him of the many proceedings during this same time period, deprived T.H. of the opportunity to take steps and assert his parental rights.

¶ 23 DCFS contends that failure to properly serve T.H. in the earlier juvenile court proceedings was basically cured, because T.H. was given the opportunity to assert his parental rights and appear before the juvenile court, after he was properly served with the termination petition and notice of trial. We reject this argument because by the time T.H. was served with the termination petition, the basis for seeking a termination had already occurred during the time period between removal of the children and filing of the termination petition. We hold that due to the failure of DCFS to inform T.H. of the neglect proceedings involving his children, he was not given a meaningful opportunity to demonstrate interest in his children and assume parental responsibility for them. This is a violation of T.H.'s due process rights. *See In re J.P.*, 648 P.2d 1364, 1372 (Utah 1982). Therefore, we reverse the juvenile court's order terminating the parental rights of T.H.[8]

## CONCLUSION

¶ 24 Due to a lack of proper notice by DCFS, T.H. was involuntarily excluded as a potential custodian for his children after they were removed from their mother. T.H. was deprived of his constitutional right to due process, affecting his ability to sustain a relationship with his children. Further, DCFS was required to comply with rule 4 of the Utah Rules of Civil Procedure in effecting service on T.H., but did not do so. The juvenile court erred in basing its findings of abandonment and token efforts on the time period where T.H. was procedurally excluded from his children. Accordingly, we reverse.

¶ 25 WE CONCUR: JUDITH M. BILLINGS, Presiding Judge and RUSSELL W. BENCH, Associate Presiding Judge.

---

7. For example, Finding of Fact number 10 states: "[T.H.] has had abandoned the children. He has had virtually no contact with the children since they were removed from the custody of the mother."

8. We are keenly aware of the consequences of reversing the juvenile court's order of termination. However, we cannot condone or ignore the failure of DCFS to comply with notice requirements, and the potential derogation of parental rights. We only hope that T.H. takes this opportunity to become a meaningful part of his children's lives or allow other willing and loving persons to assume that role.