144 P.3d 231 (2006)
2006 UT App 354
STATE of Utah, in the interest of B.R., J.R., N.R., and K.M., persons under eighteen years of age.
S.M., Appellant,
v.
State of Utah, Appellee.
No. 20050912-CA.
Court of Appeals of Utah.
August 31, 2006.
*234 Angela F. Fonnesbeck, Hillyard Anderson & Olsen, Logan, for Appellant.
Mark L. Shurtleff, Attorney General's Office, and John M. Peterson, Asst. Atty. Gen., Salt Lake City, for Appellee.
Martha Pierce, Salt Lake City, Nathan W. Jeppsen, Tremonton, Guardian Ad Litems.
Before Judges BILLINGS, BENCH, and THORNE.

OPINION
THORNE, Judge:
¶ 1 S.M. (Mother) appeals from the juvenile court's October 12, 2005 Amended Findings of Fact, Conclusions of Law, and Order Terminating Parental Rights (the Termination Order), which terminated Mother's parental rights in her children B.R., J.R., N.R., and K.M. (the Children). We reverse the Termination Order as it applies to Mother and remand this matter for further proceedings.

BACKGROUND
¶ 2 "`Because the termination of parental rights is fact sensitive, we review the facts of the controversy in detail.'" In re A.H., 2004 UT App 39, ¶ 1 n. 1, 86 P.3d 745 (quoting In re M.L., 965 P.2d 551, 553 n. 1 (Utah Ct.App. 1998)).
¶ 3 Mother is the natural mother of B.R., born January 7, 1994; J.R., born April 6, 1998; N.R., born March 18, 2001; and K.M., born October 22, 2002. The State has been involved with Mother and the Children since approximately the summer of 2000, when Mother and the Children were residing in Weber County. In 2002, the family moved to Logan, and the case was transferred to Cache County.
¶ 4 By April 2004, Mother relapsed into methamphetamine use. Recognizing that she was not currently able to meet the Children's needs, Mother took them to the Child and Family Support Center in Logan. Mother informed personnel there that she was unable to care for the Children and felt like she was going to have a nervous breakdown. As a result, the State removed the Children from the custody of Mother and J.M. (Father), the father of N.R. and K.M.[1]
¶ 5 On May 11, 2004, the parties participated in court-ordered mediation and agreed to a service plan for Mother with a goal of reunification. Based on the parties' stipulations, the juvenile court entered findings that the Children were lacking proper parental care due to Mother's substance abuse and found the Children to be neglected. Mother entered into a service plan covering the period of April 16 through October 16, 2004. The service plan required that Mother: (1) obtain a substance abuse evaluation and follow recommended treatment, provided financing could be arranged; (2) submit to random urinalysis testing; (3) remain drug and alcohol free; (4) complete domestic violence and anger management courses and *235 follow recommendations; (5) complete a mental health assessment and follow recommendations; (6) maintain housing and stable employment; and (7) maintain a home for the Children at or above the minimum standards established by the Department of Child and Family Services (DCFS). Subsequently, the parties entered into a second six-month service plan containing virtually identical provisions and continuing until April 16, 2005.
¶ 6 On December 9, 2004, an eight-month permanency hearing was held for K.M. See Utah Code Ann. § 78-3a-311(2)(g)(i) (Supp. 2006) (mandating that a permanency hearing be held "eight months after the date of the initial removal" for children under three years of age). At this hearing, the parties stipulated and the juvenile court found that Mother had made substantial efforts to comply with her service plan with regard to K.M. The juvenile court continued reunification services for Mother and K.M.
¶ 7 On April 22, 2005, a second permanency hearing was held, this time relating to all four children. The juvenile court found that Mother had not substantially complied with the requirements of her service plan. The court's order from the permanency hearing, entered on June 9, 2005, made clear that the court had made its factual findings regarding Mother's substance abuse and other failings under the "clear and convincing evidence" standard, rather than the lower "preponderance of the evidence" standard.[2]
¶ 8 The juvenile court's June 9 factual findings catalogued Mother's failures to comply with her service plan in great detail. Regarding the central issue of Mother's drug rehabilitation, the court found that Mother had attended but not completed outpatient counseling with the Bear River Health Department from May through July 2, 2004; attended inpatient treatment at the House of Hope from November 18, 2004 through January 25, 2005; and attended some impatient treatment at the Women's Recovery Center. The court also found that Mother did not attend treatment at the Odyssey House as recommended because of a payment issue and did not attend treatment at the Women's Detox Center.
¶ 9 Regarding visitation, the juvenile court found that Mother attended thirty-four visits with the Children during the twelve-month reunification period and did not attend more visits because she was using methamphetamine and did not want the Children to see her under the influence. The juvenile court also found that there was no stable housing for the Children because Mother had resided in various substance abuse programs and with the Children's maternal and paternal grandparents; that Mother had not been employed during the reunification period; and that Mother had been unable to meaningfully participate in therapy with the Children due to her ongoing substance abuse.
¶ 10 The juvenile court's findings also addressed the Children's emotional and physical condition. Relying on the testimony of Dr. Tim Mitchell, a counselor who had conducted mental health assessments of the Children, the court found that "the [C]hildren have experienced a lack of stability in their lives, and they each have a need for stability in their lives. Very little has changed in the lives of the parents. This places the [C]hildren at risk of detriment to their physical and emotional well-being." Based on these concerns and Mother's failure to address her problems, the juvenile court then found that the Children could not be safely returned to their parents' custody.[3]
¶ 11 Mother requested that the juvenile court extend the reunification period for ninety days. See Utah Code Ann. § 78-3a-312(4)(d) *236 (Supp.2006).[4] The juvenile court denied Mother's request, concluding that Mother had not substantially complied with her service plan, that it was not probable that Mother would be ready and capable to care for the Children and meet their needs within ninety days, and that an extension was not in the Children's best interests. The court made these findings despite Dr. Mitchell's testimony that he did not think it would hurt to extend the matter for an additional ninety days.
¶ 12 The juvenile court terminated reunification services and ordered the permanency goal for the Children changed to termination of parental rights and adoption. The juvenile court ordered the State to file a petition for termination of parental rights, and the State did so on May 12, 2005. Mother denied the contents of the petition, and the juvenile court scheduled a termination trial for August 23 and 24, 2005.
¶ 13 Trial took place as scheduled. Mother testified twice, once as the State's witness and later as part of her own defense. Mother's cumulative testimony related her long history of methamphetamine use, including periods of sobriety and relapse. Mother testified that she had first used methamphetamine over eight years ago and that since then she had maintained her sobriety for one period of three years and another period of one year. She also described her previous attempts toward rehabilitation, her employment and housing history, and the amount of visitation she had exercised during the reunification period.
¶ 14 Mother also testified in great detail about her present parenting ability and the corrective actions she had taken following the permanency hearing. Mother testified that, after the permanency hearing and the termination of services by the court, she had maintained sobriety for over five months; completed a truck driving program and obtained a commercial driver license; engaged in individual and group counseling with Weber Human Services; regularly submitted to and passed random urinalysis tests; began working on a twelve-step recovery program through Narcotics Anonymous (NA); attended NA meetings at least once a week; obtained full-time employment with benefits; paid child support to the State; obtained housing; attended weekly church services; filed for divorce from Father; and continued meaningful visitation with the Children. Mother's testimony was largely documented and uncontradicted by the State.
¶ 15 Mother's social worker, Richard Tucker, and her NA sponsor, Darla Brennan, provided testimony supporting Mother's rehabilitative efforts since the permanency hearing.[5] Tucker is a licensed social worker from Weber Human Services in Ogden who had been working with Mother since May 23, 2005. He testified that Mother had attended eight individual counseling sessions with him, five domestic violence group meetings, one educational drug and alcohol group meeting, and provided twenty-five clean random urinalysis tests. He also testified that Mother was doing well but that it was hard to predict whether that would continue. Brennan had been Mother's NA sponsor since April 2005. She testified that Mother works hard, attends meetings, and is working on the fourth step of the twelve-step recovery program utilized by NA.
¶ 16 The State presented evidence pertaining to the needs of the Children and each child's foster care placement and adoption prospects.[6] This evidence was presented largely through the testimony of Debra Braegger, the family's caseworker since April *237 2004, and Wanda Lundahl, a child protection worker who had been working with the family since April 2002. The State also presented testimony from the Children's therapist, Dr. Mitchell, who testified to the results of the mental health assessments he administered for each child, and from each child's foster mother. Testimony was also elicited from the paternal grandparents with respect to their observations of Mother and the Children during visitation and the drug use of both parents.
¶ 17 Following the State's case, Mother presented further uncontradicted evidence, including testimony from herself and Braegger. Braegger testified about Mother's new apartment, and gave specifics regarding the stipulation at the eight-month permanency hearing that Mother had made substantial efforts to comply with the service plan. Mother testified in more detail with respect to efforts made to comply with the service plan since the termination of reunification services, including her abstinence from drugs and obtaining employment and housing. Mother testified about her development of a family support system and other changes she had implemented in her life to prevent relapses during stressful events. With regard to visitation during the reunification period, Mother testified that she had requested additional visitation with the Children but that transportation issues had made visitation difficult or impossible during the three months that she was in inpatient treatment.[7] Mother also presented the testimony of Lori Rumsa, a member of NA who testified that Mother was fully invested in recovery at the time of trial.
¶ 18 After closing arguments from the parties, the juvenile court entered oral findings reiterating the findings from the permanency hearing and stating that "[t]he testimony of the last two days that this court has received is very similar to what this court has heard before and is pursuant to the findings the court made in the [previous orders from the permanency hearings]." The juvenile court proceeded to discuss the relevant testimony and stated in its summation of the evidence that Mother had failed to complete four drug programs and had started another program in which her therapist testified that he had no idea what was going to happen. The court acknowledged that Mother was on the fourth step of a twelve-step program and had recently obtained a suitable home and a job.
¶ 19 The court concluded, based upon Mother's history of inconsistency and the evidence presented, that Mother was unfit pursuant to the statute despite her progress. The court ordered Mother's parental rights permanently terminated, and placed custody and guardianship of the Children with the State for purposes of adoption.
¶ 20 On October 12, 2005, the juvenile court entered its written findings in the Termination Order. The Termination Order incorporated verbatim many of the findings that the court had made against Mother by clear and convincing evidence after the April permanency hearing, and also contained findings summarizing much of the evidence presented at the termination trial.[8]
¶ 21 Mother appeals from the Termination Order.

ISSUES AND STANDARDS OF REVIEW
¶ 22 In reviewing a termination of parental rights, "`[a]pplication of statutory law to the facts presents a mixed question of fact and law.'" In re S.H., 2005 UT App 324, ¶ 12, 119 P.3d 309 (quoting In re G.B., 2002 UT App 270, ¶ 11, 53 P.3d 963). "We review the juvenile court's findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." Id. (quotations and citation omitted).
¶ 23 "`Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous.'" In re S.Y., 2003 UT App 66, ¶ 11, 66 P.3d 601 (quoting In re G.B., 2002 UT App 270 at ¶ 9, *238 53 P.3d 963). Under the clearly erroneous standard, factual findings will be set aside when they "`are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made.'" Id. (quoting In re S.L., 1999 UT App 390, ¶ 20, 995 P.2d 17).

ANALYSIS

I. Past Conduct Versus Present Parenting AbilityA Review
¶ 24 This case presents a termination of parental rights issue that this court has addressed before, namely the required balancing of a parent's prior conduct justifying removal of a child from the home against the parent's present ability to act as a fit parent and provide a suitable home for the child. In particular, this case presents a situation where the bulk of the parent's improvement has occurred after a permanency hearing terminating reunification services and setting a goal of termination, but prior to the termination trial itself.
¶ 25 The rule of law on this issue is straightforward enough:
[T]he weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent displayed an unwillingness or inability to improve his or her conduct and on any destructive effect the parent's past conduct or the parent's delay in rectifying the conduct has had on the parent's ability to resume a parent-child relationship with the child.
In re M.L., 965 P.2d 551, 561 (Utah Ct.App. 1998). Many parental rights termination proceedings involve a claim of recent improvement in parenting ability to one degree or another. At least ten cases from this court have applied the In re M.L. standard since it was established in 1998, although only one of those cases has resulted in a published opinion. See In re S.L., 1999 UT App 390, 995 P.2d 17. We believe that it is time to revisit the issue and provide clarification and explanation of developments that have occurred in the eight years since In re M.L. was decided.

A. A.E. v. Christean

¶ 26 Our review begins with this court's 1997 opinion in A.E. v. Christean, 938 P.2d 811 (Utah Ct.App.1997), a case that did not touch directly on the issue of present parenting ability. Nevertheless, A.E. provides the theoretical background for the In re M.L. decision, and is noted in several other cases that do address present parenting ability. A.E.'s central holding that a permanency hearing cannot be held simultaneously with a trial on termination of parental rights has been partially overruled by statute, but the case remains good law on several points relevant to this appeal. See A.E., 938 P.2d at 814; see also Utah Code Ann. § 78-3a-312(8)(a).
¶ 27 In A.E., A.E. petitioned for extraordinary relief, seeking to have this court order the juvenile court to hold a twelve-month dispositional review hearing[9] to address whether she was entitled to regain custody of her child, N.E. See 938 P.2d at 811. Both N.E.'s grandparents and the State had petitioned for the termination of A.E.'s parental rights, and the juvenile court had ruled that it intended to address A.E.'s motion to restore custody at the termination trial. See id. This court held that the dispositional review hearing was mandatory and could not be held at the same time as the proceeding to terminate A.E.'s parental rights. See id. at 814.
¶ 28 The A.E. holding rested in large part on application of Utah Code section 78-3a-312(1)'s language that "`[a] dispositional review hearing shall be held.'" A.E., 938 P.2d at 814 (quoting Utah Code Ann. § 78-3a-312(1) (1996)). A.E. determined that such a hearing is mandatory. See id. at 815. The court then turned to whether the dispositional *239 review hearing could be held simultaneously with the termination trial and determined that it could not, stating that:
The Juvenile Court Act establishes sequential steps which must be followed once a child is removed from a parent in abuse, neglect, and dependency proceedings. To combine a dispositional review hearing with a termination of parental rights hearing . . . would bypass the steps established by the Legislature for final determination of a child's status.
Id. at 816 (citations omitted). The court observed that the State essentially decided that the permanency goal was to be termination before the juvenile court had a chance to determine if A.E. had successfully complied with her service plan. See id. The court characterized this as reversing the process implemented by the Legislature. See id.; see also Utah Code Ann. § 78-3a-312 (1996) (contemplating that a juvenile court judge will determine the success of a service plan before the State develops a permanent plan for the child).
¶ 29 A.E. contained an alternative analysis based on policy concerns rather than statutory interpretation. Independent of the dictates of section 78-3a-312, the A.E. court stated that "the dispositional review hearing should not be combined with a termination of parental rights hearing because (1) it places an unfair burden on [the parent], (2) the separate hearings focus the juvenile court on different issues of fact and law, and (3) each involves different burdens of proof." A.E., 938 P.2d at 816.
¶ 30 With regard to the unfair burden on parents, the court stated that combining the permanency hearing with the termination trial inherently places the parent "at a disadvantage." Id. The court stated that combining the two proceedings creates "the inference that [the parent] will be unable to show improvement for purposes of [the permanency hearing]." Id. The court also found that "an inference is likely that . . . parental rights should be terminated." Id.
¶ 31 The court also observed that the "focus in a [permanency] hearing and a termination of parental rights hearing involves different issues of fact and law." Id. A permanency hearing focuses on whether the child can be safely returned to the home, while a termination hearing focuses on whether "a parent is unfit or incompetent based on the grounds for termination of parental rights under [Utah Code] section 78-3a-407, and that it is in the best interest of the child to terminate parental rights." Id. at 817; see also Utah Code Ann. §§ 78-3a-406, -407 (1996). Thus, "a dispositional review hearing is directed toward giving parents assistance and an opportunity to improve their parenting skills and be reunited with their children, and also to provide parents with notice that if they fail to remedy their conduct, their parental rights may be terminated" at a subsequent termination trial. A.E. v. Christean, 938 P.2d 811, 816 (Utah Ct.App.1997).
¶ 32 Further, the A.E. court observed that the burden of proof at a permanency hearing is, at most, a preponderance of the evidence:
[I]f reunification services were ordered by the juvenile court under [Utah Code] section 78-3a-311, the court must return custody of the child to his or her parent "unless it finds, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to his [or her] physical or emotional well-being." If reunification services were not ordered pursuant to section 78-3a-311, there is no applicable presumption or burden of proof, and the juvenile court within its discretion determines whether a parent has shown improvement so as to reunify the parent and child.
Id. at 817 (citation omitted). By contrast, "[a] parent's rights may be terminated only if the grounds for termination of parental rights under [Utah Code] section 78-3a-407 have been proven by `clear and convincing evidence.'" Id. (emphasis added) (quoting Utah Code Ann. § 78-3a-406(3) (1996)).
¶ 33 For all of these reasons, both statutory and otherwise, the A.E. court determined that A.E. was entitled to a dispositional hearing on custody before the juvenile court could hold a trial on termination of her parental rights. See id. at 817. The A.E. court ultimately remanded the matter to the juvenile *240 court with instructions "to comply with the law as discussed herein." Id.
¶ 34 In 1998, Utah Code section 78-3a-312 was amended to allow courts to consolidate permanency hearings with termination trials if a petition for termination of parental rights is filed prior to the date of the permanency hearing. See Utah Code Ann. § 78-3a-312(6)(c) (Supp.1998); see also Utah Code Ann. § 78-3a-312(8)(a) (Supp.2006) ("[I]f a petition for termination of parental rights is filed prior to the date scheduled for a permanency hearing, the court may consolidate the hearing on termination of parental rights with the permanency hearing."); In re F.C. III, 2003 UT App 397, ¶ 2 n. 1, 81 P.3d 790 ("Although A.E. once stood for the proposition that a permanency hearing (previously called a dispositional review hearing) could not be combined with a termination of parental rights hearing, it has since been superseded by statute." (citation omitted)).

B. In re J.N.

¶ 35 In June 1998, this court issued In re J.N., 960 P.2d 403 (Utah Ct.App.1998). In re J.N. addressed an appeal by the State from a juvenile court's decision not to terminate J.N.'s parental rights in his four children. J.N. and the children's mother had divorced in January 1994, with the mother taking custody of the children and J.N. being allowed only supervised visitation. See id. at 405. In September 1994, the mother became incarcerated and the children went to live with a maternal aunt. The maternal aunt became unable to care for the children, and in November 1994 the State petitioned for the children's custody and they were placed in foster care. See id.
¶ 36 The State issued several six-month service plans including two directed toward J.N. The first, issued in June 1995, apparently directed J.N. to, among other things, complete anger management counseling and obtain a modification of his divorce decree to allow unsupervised visitation with the children. See id. at 405-06. The second plan, issued in December 1995, "included many of the same objectives as the first service plan, [but] contained more specific time limitations, explanations, and details than the first." Id. at 405. The stated goal of the second plan was reunification of the children with J.N., as services to the mother had been terminated. See id. Both plans warned J.N. that failure to comply could result in "negative consequences, including termination of his parental rights." Id.
¶ 37 Four months into the second six-month plan, the juvenile court held a permanency hearing. See id. at 405. At that hearing, the juvenile court found that J.N. had not complied with either plan and that the children could not be safely returned to J.N. See id. at 405-06. Consequently, the juvenile court terminated reunification services to J.N. and ordered the State to set a permanency goal of adoption. See id. at 406. In May 1996, the State filed a petition to terminate J.N.'s parental rights, citing four statutory grounds including failure to change the circumstances leading to the removal of the children from the home and failure of parental adjustment. See id. at 406, 409; see also Utah Code Ann. § 78-3a-407(1)(d)-(e) (Supp.2006).
¶ 38 At some unspecified date thereafter there was a three-day trial on termination of J.N.'s parental rights. See In re J.N., 960 P.2d at 406. At trial, which was conducted by a second juvenile court judge, the juvenile court determined that the State had failed to provide clear and convincing evidence of any of the four legal grounds alleged in support of termination. The juvenile court order denying termination made multiple findings of fact to support its decision, and addressed each of the four alleged grounds for termination. However, the order also faulted the State for terminating the second six-month service plan after only four months, notwithstanding the fact that the early termination was actually ordered by the juvenile court itself. See id.
¶ 39 The State appealed, arguing that the juvenile court erred as a matter of law when it faulted the State for obeying the juvenile court's order to terminate services. See id. This court agreed, stating that we "set aside the [juvenile] court's findings because we have reached a definite and firm conviction that the juvenile court made a legal mistake that permeated its findings and consequently *241 calls into question the court's decision not to terminate J.N.'s parental rights." Id. at 410. Notably, this court expressly refused to engage in the clear error analysis that would ordinarily be required to set aside the statutory findings of the juvenile court. See id. A dissenting opinion argued that any legal error by the juvenile court did not justify ignoring its well-supported conclusions that the State had failed to show grounds for termination. See id. at 411-15 (Billings, J., dissenting).
¶ 40 Both the majority opinion and the dissent addressed, at least in dicta, the shift in focus between the permanency hearing and the termination trial, and the potential for a parent's improvement between the two proceedings. The majority opinion stated that, after a juvenile court terminates reunification services, "the State focuses on the court's new order to develop and implement the goals of the new plan designed to provide permanency to the child." In re J.N., 960 P.2d 403, 408 (Utah Ct.App.1998). The majority opinion clearly anticipated the possibility of a parent avoiding termination of parental rights even after reunification services have been terminated:
Although the State no longer provides reunification services to the family, the family may still be reunified. . . . [T]he parent's rights will not necessarily be terminated at the trial on the State's termination petition. Although it may be a difficult feat to accomplish, the parent may still be able to change circumstances such that when the petition is tried, the juvenile court will not find by clear and convincing evidence grounds for terminating parental rights.
Id. at 408 n. 8 (citation omitted).
¶ 41 The dissenting opinion defended the juvenile court's decision not to terminate J.N.'s rights at the termination trial despite ruling in the State's favor at the prior permanency hearing. The dissent emphasized A.E. v. Christean's observation that one purpose of a permanency hearing is "`to provide parents with notice that if they fail to remedy their conduct, their parental rights may be terminated.'" Id. at 413 (Billings, J., dissenting) (emphasis omitted) (quoting A.E. v. Christean, 938 P.2d 811, 816 (Utah Ct.App. 1997)). The dissent concluded:
Thus, the statute contemplates that when a trial court refuses to reunite a parent and child following a [permanency] hearing, the parent still has an opportunity in the time between the [permanency] hearing and the termination hearing to meet the goals of the permanency plan and regain custody of the child.
Id. (Billings, J., dissenting).
¶ 42 These statements in the majority and dissenting opinions were not essential to the holding, and they can properly be considered dicta. Nevertheless, the case represents this court's clearest expression on the subject and provides substantial support for the court's subsequent decision in In re M.L.

C. In re M.L.

¶ 43 In August 1998, this court issued In re M.L., 965 P.2d 551 (Utah Ct.App.1998). The appellant, S.L., claimed "that the juvenile court erred in terminating her parental rights because it failed to adequately consider her present parenting abilityi.e., her ability existing at the time of the termination trialto care for M.L." and that the evidence of her present ability "should have been sufficient to overcome the deficiencies in her prior conduct." Id. at 559. The court held that, at a termination trial, evidence of present parenting ability must necessarily be weighed against the length of time during which the parent failed to improve her conduct and any harm that the original misconduct, and the delay in rectifying that conduct, has caused to the parent-child relationship. See id. at 561.
¶ 44 In re M.L. arose from the juvenile court's 1997 termination of S.L.'s parental rights in her youngest son, M.L. However, the State's involvement with S.L. and her other children, N.T., R.P., and T.T., dated back to 1992, when N.T. had threatened to kill herself. See id. at 553. The State provided treatment services for N.T. at that time.
¶ 45 Between 1992 and 1994, the State investigated problems between R.P. and S.L.'s physically abusive boyfriend, M.L. Sr. *242 R.P. was eleven years old at the time the investigation began. The State prepared four separate treatment plans indicating that S.L. would attend parenting classes when such classes were available, but S.L. never complied with any of the plans' recommendations. S.L. gave birth to M.L. in March 1993, and married M.L. Sr. in February 1994. See id. at 553-54. About that time, S.L. requested a "pickup" on R.P. because he had run away. Id. at 554.
¶ 46 In November 1994, S.L. was incarcerated for a string of drug offenses and a forgery offense committed in the previous two months. See id. During the course of these offenses, S.L. left three-year-old T.T. and eighteen-month-old M.L. with her eldest daughter N.T. and a friend, and at other times with known drug users. N.T. could not care for the children and the State took T.T. and M.L. into protective custody in November 1994. The juvenile court placed the two children with S.L.'s brother B.T. and his wife under State supervision. In March 1995, T.T. died from a nonaccidental head injury that resulted in criminal charges against B.T.'s wife. M.L. went back into State custody.
¶ 47 S.L. remained incarcerated until May 1995, when she was released on probation to a drug treatment facility. See id. Arrangements were made for M.L. to join S.L. at the facility, but the day before he was to arrive S.L. tested positive for Valium. This resulted in her discharge from the program, revocation of her probation, and her return to prison. S.L.'s drug use was also a violation of her latest treatment plan.
¶ 48 At a twelve-month permanency hearing held in March 1996, the juvenile court ordered reunification services for M.L. Sr. extended for 120 days. See id. In July, the juvenile court ordered a trial home placement of M.L. with M.L. Sr. and ordered the State to prepare a plan to assist S.L. upon her release from prison. S.L. was released July 31, but less than two weeks later M.L. Sr. was arrested and incarcerated on drug charges and M.L. was returned to State custody. The State determined that S.L. would not be able to safely care for M.L. for six months to a year, and at a September permanency hearing the juvenile court terminated services and changed the permanency goal for M.L. to adoption. See id. at 554-55.
¶ 49 A termination trial occurred in March 1997. See In re M.L., 965 P.2d 551, 555 (Utah Ct.App.1998). S.L.'s trial strategy was to demonstrate that her recent improvements had rendered her a fit parent whose rights should not be terminated. To that end, she presented evidence that
during her most recent period of incarceration, she completed all available parenting classes and maintained regular visitation with M.L.; that, as part of her parole, [S.L.] completed a sixteen-week substance abuse mental health therapy class at Valley Mental Health in January 1997; that she has not used drugs for eighteen months; that she has lived with her mother and sister in Magna since being paroled; that she pays room and board to her mother, as well as monthly restitution payments in connection with her forgery convictions; that she has worked as a waitress at the same restaurant essentially since her release from prison; and that she has a positive relationship with her parole officer and is in compliance with her parole agreement.
Id. However, S.L. also presented testimony that the juvenile court regarded as unfavorable, including blaming R.P. for her problems with him, denying in the face of evidence to the contrary that M.L. Sr. had physically abused R.P., defending her decision to leave M.L. with known drug users, denying her need for continued substance abuse classes, and rejecting the State's suggestions for positive changes in her life as interference with her ability to raise her son as she saw fit. See id.
¶ 50 The juvenile court also heard testimony from S.L.'s mother, and evidence from the State regarding M.L.'s current emotional and psychological state, including his progress with "reactive attachment disorder" that he developed as a result of his separation from S.L. and his multiple placements while in State care. Id. The State presented evidence that M.L. had lived with six different caretakers since his birth, and a psychiatrist's testimony that M.L. needed permanency *243 and stability. On May 2, 1997, the juvenile court terminated S.L.'s parental rights on grounds of unfitness and failure of parental adjustment. See id.
¶ 51 On appeal, S.L. asserted that her rehabilitative efforts during her second period of incarceration demonstrated her fitness as a parent at the time of trial, despite her previous failings. This court analyzed S.L.'s argument in light of the great deference shown to juvenile court findings and conclusions, the State's interest in avoiding a "legal limbo" for children in its custody, the twelve-month period allowed by statute[10] during which parents may correct their behavior after their children are removed, and the negative effect that such a period of separation may have on the parent-child relationship. Id. at 560. In light of these considerations, the court determined that a juvenile court must consider the parent's prior conduct and the effect of that conduct on the parent-child relationship, balancing that evidence against evidence of a parent's present ability:
We conclude that the weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent displayed an unwillingness or inability to improve his or her conduct and on any destructive effect the parent's past conduct or the parent's delay in rectifying the conduct has had on the parent's ability to resume a parent-child relationship with the child. Thus, although the court has a duty to look forwardi.e., to look at the parent's present ability and the likelihood that the parent will be able to resume parenting within a reasonable timethe court must consider such evidence in light of the parent's past conduct and its debilitating effect on the parent-child relationship. That is, if a parent has demonstrated some improvement in parenting ability but not a strong likelihood that the parent can provide a proper home for the child in the very near future, after a long period of separation, a history of problems and failure to remedy, and deterioration of the relationship between the child and parent, this court should not overturn a court's order terminating parental rights.
Id. at 561-62 (footnote omitted).
¶ 52 The court then applied this balancing approach to the facts and circumstances leading to the juvenile court's termination of S.L.'s rights on grounds of parental unfitness and failure of parental adjustment. As to parental unfitness, the court summarized the various negative effects that S.L.'s drug use and her long separation from M.L. had had on him. These negative effects included M.L.'s development of reactive attachment disorder and a deterioration of the parent-child relationship. The court found that, despite evidence of S.L.'s recent efforts, this evidence of the breakdown in the parent-child relationship warranted termination of S.L.'s rights: "Whatever [S.L.'s] present situation and desire, there is no question that her conduct in the past has affected her relationship with M.L. and that her current interaction with him reflects [S.L.'s] continued inability to fulfill a parental role." Id. at 562.
¶ 53 Addressing S.L.'s failure of parental adjustment, the court determined that the juvenile court's termination of S.L.'s rights on this ground was also supported by sufficient evidence. The court noted that S.L. had completely failed to comply with her first treatment plan. "Furthermore, although [S.L.]'s progress on the second treatment plan was more substantial, she still failed to provide DCFS with a psychological evaluation, which was to serve as the basis for future plans." Id.
¶ 54 Regarding S.L.'s claims of recent improvement, the court focused on the juvenile court's finding that "although [S.L.] was involved in numerous self-improvement courses and programs [while in prison,] she has been unable to internalize what she has been taught relative to child care and child development in the courses she completed." In re M.L., 965 P.2d 551, 562 (Utah Ct.App.1998) (second alteration in original) (quotations *244 omitted). The court held that this finding was adequately supported by the evidence of S.L.'s continued blaming of R.P. for her husband's abusive actions, excusing her own lack of appropriate response to that abuse, defending N.T.'s drug use, minimizing her own drug problems, and generally rejecting any efforts by the State to improve her parenting skills. This evidence demonstrated to the court that S.L.'s parenting abilities had not improved despite her efforts and that her "present ability remain[ed] inadequate." Id.

D. In re S.L.

¶ 55 The only reported opinion applying In re M.L.'s present parenting ability analysis is In re S.L., 1999 UT App 390, 995 P.2d 17. In In re S.L., this court determined that the juvenile court's conclusion of law that appellant C.A. was an unfit parent to her son S.L. was supported by the following findings of fact:
Parental Fitness and Competence
. . . .
4) On or about August 29, 1997, [S.L.] was removed from the custody of his mother after he had found marijuana in his mother's purse and gave it to his grandparents. The grandfather hid the marijuana from [C.A.] which resulted in a violent reaction from [C.A.,] who was charged with assault and possession of marijuana. When [S.L.] was taken into custody, he had a bite mark on his cheek which had been inflicted by his mother as a form of discipline;
. . . .
6) When [S.L.] was taken into custody, [C.A.] had been basically living on the streets for the previous six to eight months. [S.L.] had been residing with his maternal grandparents when he was taken into custody by the State and he viewed his grandmother as his mother;
7) Prior to [S.L.'s] removal, [C.A.] had a history of using cocaine, marijuana, and methamphetamines. She had allowed [S.L.] in residences where illegal drugs were being used and was periodically under the influence of drugs while she was around [S.L.];
. . . .
16) During the operation of the first treatment plan, [C.A.] failed to complete drug treatment; failed to maintain a drug free lifestyle, she failed to obtain and maintain suitable housing or employment, did not complete a parenting class, anger management counseling, or peer parenting, and failed to complete individual therapy;
. . . .
30) During September of 1997 through January of 1998, [C.A.] had ongoing but irregular visitation with [S.L.] even when she was in substance abuse programs. [S.L.] was somewhat tentative in his visitation with his mother during this time frame and had minimal interaction with her. Visitation was suspended between February and May 1998, because [C.A.] was not involved in substance abuse treatment. [C.A.] didn't have any contact with [S.L.] during this time and he progressed well in her absence.
. . . .
Best Interest of the Child
. . . .
3) [C.A.] doesn't fully comprehend [S.L.'s] needs and does not presently have the skills to successfully parent him;
. . . .
5) [S.L.] does not view [C.A.] as his mother and does not demonstrate any spontaneous affection toward [C.A.]. [S.L.] shares a strong attachment with his foster mother who he views as his mother. He is very unsure about himself and needs to know where [h]is foster mother is at all times. [S.L.] is very affectionate toward his foster mother and foster family.
6) [S.L.] needs a nurturing, stable relationship with a supportive adult who will help him address his many issues. His relationship with his foster mother gives him the security he needs to successfully confront his emotional problems. He needs a "stay-at-home" mother because he cannot presently tolerate day care and he is thriving in his foster home where he has a stay-at-home mother;
7) [C.A.] is not capable of parenting [S.L.] at this time and [S.L.] would not allow his *245 mother to parent him if he were placed with her today. . . .
Id. at ¶¶ 13-14 (alterations in original).
¶ 56 Despite these findings, C.A. made essentially the same argument that Mother raises in the present case: "that her progress towards being a fit parent precludes a conclusion that she was unfit at the time of trial." Id. at ¶ 33 (emphasis added). In re S.L. rejected that argument on the facts of that case, restating the In re M.L. rule that "the juvenile court must consider a parent's present ability, [but] it must also consider the parent's past conduct and the time during which the parent has failed to remedy the situation, thereby causing further deterioration of the parent-child relationship." In re S.L., 1999 UT App 390 at ¶ 33, 995 P.2d 17.
¶ 57 The court did not explicitly identify which factual findings supported each factor established in In re M.L., but each is clearly established in the findings quoted above. Ultimately, the court concluded that "the evidence showed that even at the time of trial some fifteen months after S.L. was placed in DCFS custodyC.A. was unable to adequately parent S.L." In re S.L., 1999 UT App 390 at ¶ 35, 995 P.2d 17. Accordingly, the court affirmed the termination of C.A.'s parental rights.

E. Unreported Cases
¶ 58 There have been at least nine unreported cases applying the In re M.L. standard. Each affirmed the juvenile court's termination of parental rights, determining that the evidence of prior unfitness or other grounds for termination outweighed any evidence of present parenting ability. As memorandum decisions, these cases generally include little or no factual background and a truncated legal analysis, and we review them only briefly and for the sake of completeness.
¶ 59 In In re A.S., 1999 UT App 67, 1999 WL 33245005, 1999 Utah App. LEXIS 315 (Mar. 4, 1999), a mother apparently presented evidence of progress occurring after the termination of services, and testified that she no longer had a drug problem. The juvenile court found that her drug problem still existed at the time of trial. This court determined that the juvenile court had "properly considered appellant's recent improvements in light of her past failures." Id. at *1. The court also determined that the nearly two-year separation of mother and her children had "necessarily harmed her relationship with the children, and the destruction of the relationship was hastened by [the mother's] failure to keep scheduled visits." Id.
¶ 60 In In re K.P., 1999 UT App 135, 1999 WL 33246519, 1999 Utah App. LEXIS 318 (Apr. 29, 1999), a mother challenged the juvenile court's finding of unfitness. This court determined that the findings that mother pointed to as establishing fitness merely "allude[d] to testimony and suggest[ed] the possibility of fitness." Id. at *1 n. 1. The court also relied on the mother's failure to challenge any of the other four grounds for termination relied upon by the juvenile court.
¶ 61 In In re J.B., 2001 UT App 33, 2001 WL 311172, 2001 Utah App. LEXIS 291 (Feb. 1, 2001) (per curiam), a father argued that the juvenile court gave insufficient weight to evidence of his present parenting ability. This court affirmed the juvenile court's finding that evidence of recent improvement was outweighed by the length and magnitude of domestic violence in the home, its effect on J.B., and the father's failure to address his alcohol and substance abuse problems.
¶ 62 In In re A.M., 2003 UT App 22, 2003 WL 21290941, 2003 Utah App. LEXIS 407 (Feb. 6, 2003), a mother alleged substantial rehabilitative progress while housed in a drug treatment facility, presenting evidence that she "visited the children, paid child support, obtained her GED, attended school, pursued certification as a forklift operator, attended Alcoholics Anonymous, and completed parenting classes." Id. at *2 n. 3 (Davis, J., concurring). This court relied on the mother's extensive history of drug involvement and incarceration, including a sentence for a federal weapons conviction that was pending at the time of the termination trial, to affirm the juvenile court's termination findings.
¶ 63 In In re A.R., 2005 UT App 182, 2005 WL 914150, 2005 Utah App. LEXIS 187 (Apr. 21, 2005) (per curiam), this court did *246 not expressly apply the In re M.L. standard, but rejected a father's argument that the juvenile court had failed to address his ability to parent the children by noting that the juvenile court's fact findings "specifically reference [the father's] past and present parenting abilities." Id. at *2.
¶ 64 In In re E.V., 2005 UT App 250, 2005 WL 2840260, 2005 Utah App. LEXIS 513 (June 3, 2005) (per curiam), the juvenile court had found that a mother's "participation in drug counseling and her stable employment were motivated by her [criminal] probation and did not demonstrate a `substantial or enduring change.'" Id. at *1. The juvenile court had also found that, at the time of the termination trial, mother lacked adequate parenting skills, particularly in light of one child's special needs. This court determined that the evidence below supported the juvenile court's findings.
¶ 65 In In re B.A.P., 2005 UT App 337, 2005 WL 2840280, 2005 Utah App. LEXIS 494 (July 29, 2005) (per curiam), cert. granted, 126 P.3d 772 (Utah 2005),[11] this court affirmed the termination of parental rights of two parents, despite their contention that "they had made significant efforts to improve their ability to parent by obtaining marriage counseling on their own initiative." Id. at *2. This court did not overturn the termination despite the parents' improvement due to "the length of separation and the failure to demonstrate that the parents can provide a stable home for the children, who have been in an [out-of-home] placement since December of 2001." Id. at *2.
¶ 66 In In re D.H., 2005 UT App 510, 2005 WL 3219715, 2005 Utah App. LEXIS 527 (Dec. 1, 2005), cert. denied, 133 P.3d 437 (Utah 2006), a mother challenged the juvenile court's termination findings by alleging that the juvenile court was presented with "no evidence of present unfitness." Id. at *1. This court found that the juvenile court's findings were supported by the mother's "previous history with DCFS, her drug use, her incarceration, and her placement of [D.H.] in the care of a convicted sex offender." Id. at *2.
¶ 67 In In re D.N., 2006 UT App 194, 2006 Utah App. LEXIS 209 (May 11, 2006), the juvenile court found:
Although the evidence is clear that there's a bond of love and affection between the children, these parents have done nothing until the eleventh hour to remedy the circumstances. In fact, the court is very discouraged and bothered by the fact that as recently as May of this year, the mother was still using drugs, and that this baby was born testing positive for drugs. It was only a month or two before this trial that the parents have finally stepped up to the plate and done some drug tests and tried to get into treatment, but until that point, they have done nothing to change the circumstances.
Id. at *3. Relying on this finding, this court affirmed the juvenile court on each of the five grounds for termination, but particularly on the ground of failure of parental adjustment.

F. Adoption and Safe Families Act
¶ 68 In 1997, Congress passed the Adoption and Safe Families Act of 1997 (ASFA). See Pub.L. No. 105-89, 111 Stat. 2115 (1997). The passage of ASFA represented a shift from an emphasis on protracted reunification efforts to an emphasis on prioritizing safety and expedited permanency planning for children at risk. Under ASFA, state agencies and courts are obligated to provide permanency placement for children at the earliest possible time by expediting termination of parental rights[12] and allowing agencies to utilize concurrent planning.[13] Furthermore, *247 when the state agency proposes a permanent placement plan which has lesser guarantees of permanency and stability it must justify that decision with compelling reasons. See id. § 302(4). Utah has adopted programs with goals similar to those expressed in ASFA.[14]See In re A.C., 2004 UT App 255, ¶ 13 n. 7, 97 P.3d 706. We review the matter before us in keeping with ASFA's goal of providing a safe and expedited permanent placement for the Children. Thus, a brief analysis of ASFA and its application to this case is discussed as a backdrop to current child welfare strategies.
¶ 69 The mandate to expedite permanency decisions and termination of parental rights necessitates early, effective, and focused rehabilitation efforts by the State and the parents. This more restrictive time frame may pose a special problem for families affected by alcohol or drug abuse, where in many instances it may take multiple attempts at rehabilitation with different treatment plans before a parent rehabilitates. Therefore, treatment may take longer than fifteen months, triggering termination proceedings before the parent has completed rehabilitation. In such a situation, where substantial efforts have been made and the parent's rehabilitation is still in progress at the time of the termination hearing, the juvenile court may find itself faced with a petition to terminate parental rights in a case where return of the child is not immediately possible. The juvenile court is then faced with balancing the State's obligation to provide the child with expedited permanency and upholding the integrity of a family that is currently in crisis.
¶ 70 ASFA contemplates the situation in which termination may not be appropriate within the expedited time frame by providing exceptions to the requirement that state agencies file a petition to terminate parental rights when a child has been in foster care for fifteen of the most recent twenty-two months.[15] In addition, the state agency is not prevented from proposing a permanent placement plan that has lesser guarantees of permanency and stability than adoption. The State, however, in proposing such a plan must justify the decision with compelling reasons. Thus, the juvenile court in such a circumscribed situation is not limited to immediately terminating parental rights or returning the child to the parent. Rather, the juvenile court may utilize extended visits, trial home placement, or any other plan that it deems appropriate given the particular circumstances of the parties and in keeping with its obligation to provide expedited permanency placement.
¶ 71 In addition, the juvenile court should carefully consider each child's individual characteristics, circumstances, and risk of placement disruptionthe termination of a placement because of difficulty within the placementin determining whether adoption or reunification is in the best interest of the child. A recent study suggests that adoption is not a panacea for children who have been removed from their parents' homes, finding that twenty-three percent of adoptive placements become disrupted and twenty-eight *248 percent continue but experience substantial difficulties. See Alan Rushton & Cherilyn Dance, The Adoption of Children from Public Care: A Prospective Study of Outcome in Adolescence, 45:7 J. Am. Acad. Child Adolesc. Psychiatry 877 (2006).[16] A juvenile court should carefully consider each child's risk for disruption and other difficulties related to placement, balanced against the risks of attempted reunification, when devising a permanency placement plan of adoption, to ensure that the plan is in the best interest of the child.
¶ 72 Similarly, a juvenile court that finds termination of parental rights inappropriate or otherwise not in the specific best interest of a child may utilize the exceptions outlined in section 103(E), or adopt a permanent placement plan that provides closely monitored extensions of short duration, to facilitate the child's transition back to the parent and verify that the parent has corrected the circumstances that led the child's out-of-home placement.[17]See ASFA § 103(E). Any such extension must be done in conformity with the mandate to provide permanency placement at the earliest possible time.
¶ 73 It should be noted that with regard to a child who is three years of age or younger, "if the goal is not to return the child home, the permanency plan for that child shall be adoption." Utah Code Ann. § 62A-4a-205(9)(a) (Supp.2006). However, "if the [DCFS] documents to the court that there is a compelling reason that adoption, reunification, guardianship, and kinship placement are not in the child's best interest, the court may order another planned permanent living arrangement in accordance with federal law." Id. § 62A-4a-205(9)(b).

II. Analytical Framework for Considering Rehabilitation Evidence at Termination Trials
¶ 74 Many termination trials involve, to one degree or another, a parent's claim that changes in his or her behavior or circumstances should preclude termination of parental rights. Although In re M.L. established the general rule of balancing the present against the past, no single decision to date has established an analytical framework in which to apply that rule. Today's decision may not establish that entire framework. We do, however, identify certain legal principles that bear on the issue of present parenting ability, particularly as that ability might be demonstrated by events occurring between the termination of reunification services at a permanency hearing and the time of a termination trial.

A. Permanency Hearing Findings Should Not Address Termination in the Absence of a Petition to Terminate
¶ 75 In this case, the juvenile court made multiple findings at the April 2005 *249 permanency hearing by clear and convincing evidence, despite the standard at such hearings being the lower preponderance of the evidence standard. Subsequently, the court imported many of these findings verbatim into its termination order. It is a reasonable inference in this case that the court made these findings at the permanency hearing with the intent to use them in support of any eventual order terminating Mother's parental rights. We determine that such a practice is improper and should not be employed by the juvenile courts.[18]
¶ 76 In A.E. v. Christean, this court required permanency hearings to be held separately from termination trials, in part because when the two proceedings are consolidated "an inference is likely that . . . parental rights should be terminated." 938 P.2d 811, 816 (Utah Ct.App.1997). The same concern is present here, where the juvenile court took it upon itself to treat Mother's permanency hearing as a sort of pre-termination hearing.[19] The court's entry of findings by the clear and convincing standard at the permanency hearing resulted in Mother going into her termination trial in the face of a multitude of previously established facts.
¶ 77 There may also be due process implications to the practice of making termination findings at a permanency hearing. "The United States Constitution guarantees that th[e] parental liberty interest cannot be disturbed without due process of law." In re A.H., 2004 UT App 39, ¶ 11, 86 P.3d 745; see also Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). As this court explained in In re A.H.,
"[P]arties to a judicial proceeding are entitled to notice that a particular issue is being considered by a court and must be given an opportunity to present evidence and argument on that issue before decision." Sufficient notice will "advise the parties of the specific issues which they must prepare to meet." Parties are deprived of due process when they are not properly informed of the nature of a proceeding, or notice is not given sufficiently in advance to allow preparation.
2004 UT App 39 at ¶ 11, 86 P.3d 745 (quoting In re K.M., 965 P.2d 576, 579 (Utah Ct.App. 1998)) (other quotations and citations omitted).
¶ 78 "[T]he court's focus in a [permanency] hearing and a termination of parental rights hearing involves different issues of fact and law." A.E., 938 P.2d at 816.[20] Mother had no notice that the juvenile court would be making termination findings at the permanency hearing, and thus no reason to be prepared to address termination-specific issues. While we are aware that there is inevitably a great deal of overlap between evidence of continuing grounds to keep a child out of the home and evidence that might ultimately support termination, Mother's only notice about the permanency hearing was that it might result in findings supported by a preponderance of the evidence. When, as here, a parent has no notice that termination of parental rights will be at issue, a permanency hearing ought not result in findings that can be used against the parent to establish grounds for the termination of his or her rights at a later termination *250 trial.[21]
¶ 79 Even to the extent that the two hearings might have some practical overlap of evidence, a parent is entitled to be informed "that a particular issue is being considered by a court." In re A.H., 2004 UT App 39 at ¶ 11, 86 P.3d 745 (quotations and citation omitted). Termination of parental rights is a far more serious issue than mere deprivation of custody, and a parent is entitled to sufficient notice if a permanency hearing is to address termination. See Utah Code Ann. § 78-3a-312(8)(a) (requiring the filing of a termination petition prior to the permanency hearing date if the two hearings are to be consolidated). Absent such notice, a parent might underestimate the potential gravity of the permanency hearing.[22] In certain circumstances, a parent who is without notice that more than custody is at issue might even be prepared to essentially concede the issue of immediate custody in favor of presenting a more complete picture of rehabilitation at a later termination trial. Without a notice requirement, such a strategy could well result in a full set of findings, found by clear and convincing evidence, that might simply be imported into a later termination trial.
¶ 80 Finally, this court has recently held that a permanency hearing order that merely terminates reunification services and sets a final permanency plan of adoption is not a final, appealable order. See In re A.F., 2006 UT App 200, ¶ 17, 552 Utah Adv. Rep. 55, 138 P.3d 65. In reaching this holding, we do not believe that the In re A.F. court contemplated that such a permanency hearing order might contain findings that were directly applicable to the termination of parental rights.[23] Thus, we read In re A.F. as providing further support for the proposition that permanency hearings and termination trials should generally remain separate proceedings.
¶ 81 For these reasons, we determine that when no termination petition has been filed at the time of the permanency hearing, the juvenile court should limit itself to addressing the current custodial situation and other matters pertinent to that setting, such as the child's permanency goal, and should make findings only by a preponderance of the evidence. If the State determines that grounds for termination will exist at the time of the scheduled permanency hearing, it may file a petition for termination prior to that hearing and the juvenile court may then consolidate those proceedings. See Utah Code Ann. § 78-3a-312(8)(c). If not, then the scope of the permanency hearing and its resulting findings should not be expanded merely to facilitate a subsequent termination of parental rights.

B. The State has the Ultimate Burden of Proving Grounds for Termination
¶ 82 The law is clear that the State bears the burden of proving that a parent's rights should be terminated by clear and convincing evidence. See Utah Code Ann. § 78-3a-406(3) (Supp.2006) ("The court shall in all cases require the petitioner to establish the facts by clear and convincing evidence. . . ."); see also Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("Before a State may sever completely and irrevocably the rights of parents *251 in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."). The issue of weighing past conduct against present circumstances does, however, raise the question of whether and when the burden of proof at a termination trial shifts from the State to the parent. We conclude that, even in cases where a parent may present evidence of rehabilitation to counter clear evidence of prior misconduct, the ultimate burden of proving that termination is warranted remains on the State.
¶ 83 At a termination trial, the State must "establish the elements of a prima facie case" that at least one ground for termination of a parent's rights exists. In re J.B., 2002 UT App 267, ¶ 22, 53 P.3d 958; see also In re M.L., 965 P.2d 551, 557 (Utah Ct.App. 1998) ("`A prima facie case is proven when evidence has been introduced which, in the absence of contrary evidence, would entitle the party with the burden of proof to judgment as a matter of law.'" (citation omitted)). The State may establish its prima facie case with evidence presented at the time of trial, or may rely on previous factual adjudications so long as those adjudications were made at an appropriate proceeding by the required standard of proof. See In re J.B., 2002 UT App 267 at ¶¶ 21-22, 53 P.3d 958 (allowing the juvenile court to rely on facts properly adjudicated by clear and convincing evidence at a prior hearing involving child's siblings); In re S.A., 2001 UT App 308, ¶ 30, 37 P.3d 1172 (discussing res judicata in the context of an abuse case requiring clear and convincing evidence and noting that "a conviction in the criminal proceeding would control the juvenile court as to [a mother's] culpability for [her son's] death"). At a minimum, the State's prima facie case must establish at least one of the statutory grounds enumerated in Utah Code section 78-3a-407(1). See Utah Code Ann. § 78-3a-407(1).
¶ 84 Once the State makes out a prima facie case, the burden shifts to the parent to "`persuade the court that the State had not established [grounds for termination] by clear and convincing evidence.'" In re J.B., 2002 UT App 267 at ¶ 22, 53 P.3d 958 (quoting In re E.K., 913 P.2d 771, 775 (Utah Ct.App.1996)). If the parent fails to do so, the juvenile court may properly find that the State has met its burden of proving statutory grounds for termination. See id. Even after statutory grounds for termination have been established, the burden of presenting clear and convincing evidence that the best interests of a child would be served by terminating parental rights also falls "squarely" on the State. In re C.K., 2000 UT App 11, ¶ 21, 996 P.2d 1059.
¶ 85 The burden that shifts to a parent, however, is never the burden of proof, but rather only the "burden of production." In re E.K., 913 P.2d at 775. Thus, a juvenile court should never terminate parental rights on the grounds that a parent has failed to prove that he or she is fit. Rather, the court must consider the totality of the evidence presented at the time of trial and determine if there is clear and convincing evidence to support termination. If the State has presented such evidence and the parent has failed to produce evidence to effectively rebut the State's evidence, then the court may terminate parental rights. Nevertheless, the ultimate burden of establishing grounds for termination is always on the State.

C. Constitutionally Sufficient Grounds for Termination Must Exist at Time of Termination
¶ 86 The termination of a parent-child relationship requires two separate and distinct findings on the part of the juvenile court. See In re M.L., 965 P.2d 551, 561 n. 13 (Utah Ct.App.1998).
First, the court must find that "the parent is below some minimum threshold of fitness," such as finding that a parent is unfit or incompetent based on any of the grounds for termination under section 78-3a-407 of the Utah Code. Second, the court must find that the best interests and welfare of the child are served by terminating the parents' parental rights.
In re D.B., 2002 UT App 314, ¶ 7, 57 P.3d 1102 (quoting In re R.A.J., 1999 UT App 329, ¶ 7, 991 P.2d 1118) (other citations omitted). Regarding the first finding, it is clear that the State can utilize evidence of past parental *252 conduct as part of its proof that a parent is currently unfit or incompetent. See In re M.L., 965 P.2d at 562. But it is not enough to show only that a parent has been unfit or incompetent at some time in the past. Rather, evidence of past events may be combined with evidence of a parent's inability or unwillingness to change to establish that, at the time of termination, the parent continues to fall below the "minimum threshold of fitness" required by the United States and Utah Constitutions. In re D.B., 2002 UT App 314 at ¶ 7, 57 P.3d 1102.
¶ 87 "A parent has a `fundamental right, protected by the [United States] Constitution, to sustain [a] relationship with his [or her] child.'" In re J.P., 648 P.2d 1364, 1372 (Utah 1982) (quoting In re Walter B., 577 P.2d 119, 124 (Utah 1978) (plurality opinion)); see also Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Similarly, "the Utah Constitution recognizes and protects the inherent and retained right of a parent to maintain parental ties to his or her child under Article I, § 7 and § 25. . . ." In re J.P., 648 P.2d at 1377. In the termination context, these constitutional protections translate into a rule that a parent "is entitled to a showing of unfitness, abandonment, or substantial neglect before [his or] her parental rights are terminated." Id.
¶ 88 The grounds for termination identified in Utah statute, see Utah Code Ann. § 78-3a-407, do not supersede the constitutional requirements addressed in In re J.P. Rather, the statutory grounds represent an array of situations that will often place a parent below the level of fitness at which his or her rights may be terminated. Nevertheless, unless a parent's fitness falls below the constitutional standard, parental rights may not be terminated even if the parent's behavior falls within the language of the termination statute. See In re J.P., 648 P.2d at 1377 (invalidating prior statutory scheme as unconstitutional for failure to require a showing of unfitness, abandonment, or substantial neglect). Thus, the allegations of a successful termination petition must satisfy not only the statutory requirements for termination, but also the constitutional requirements.
¶ 89 The Utah Code sets out multiple independent grounds for terminating a parent's rights in section 78-3a-407, which states that the juvenile court "may terminate all parental rights with respect to a parent if the court finds any one of the following." Utah Code Ann. § 78-3a-407(1). The statute then enumerates various fault-based grounds for termination including a parent's present unfitness or incompetence, see id. § -407(1)(c); a parent's past misconduct, see id. § -407(1)(a) (abandonment), -407(1)(b) (neglect or abuse); and a parent's failure to ameliorate past misconduct or take other actions consistent with maintaining parental rights, see id. § -407(1)(d) (failure to remedy circumstances leading to out-of-home placement); -407(1)(e) (failure of parental adjustment as defined by statute); -407(1)(f) (token parenting efforts); -407(1)(h) (failure to give a child proper care following return from an out-of-home placement).[24]
¶ 90 Further explanation of these statutory grounds is found in section 78-3a-408, which establishes the evidentiary basis that will support various grounds enumerated in section 78-3a-407. See id. § -408 (Supp.2006). Section 408 does three things. First, it sets out a non-exclusive list of "circumstances, conduct, or conditions" that a court must consider "[i]n determining whether a parent or parents are unfit or have neglected a child," along with various exceptions to those circumstances. Id. § -408(2)-(4). Second, it defines evidence of "failure of parental adjustment":
If a child has been placed in the custody of the division and the parent or parents fail to comply substantially with the terms and conditions of a plan within six months after the date on which the child was placed or the plan was commenced, whichever occurs later, that failure to comply is evidence of failure of parental adjustment.
*253 Id. § -408(5). And third, it establishes certain circumstances that constitute prima facie evidence of abandonment, see id. § -408(1), and others that constitute prima facie evidence of unfitness, see id. § -408(6).
¶ 91 Read together, sections 407 and 408 enumerate a wide variety of parental failings that provide statutory justification for termination of parental rights. Without question, most circumstances that satisfy sections 407 and 408 will also satisfy the constitutionally required "showing of unfitness, abandonment, or substantial neglect." In re J.P., 648 P.2d at 1377. However, there may be times when a parent's actions fall within the plain language of sections 407 and 408, yet fail to rise to the level where they trump the parent's constitutional interests in maintaining the parent-child relationship. In order to properly respect parental rights, we must interpret the statutes to harmonize them with constitutional requirements.[25]See State v. Mooney, 2004 UT 49, ¶ 12, 98 P.3d 420 ("In construing statutes, we are obligated to `avoid interpretations that conflict with relevant constitutional mandates.'" (quoting State v. Mohi, 901 P.2d 991, 1009 (Utah 1995))). One potential fact pattern in which constitutional concerns may trump the plain statutory language is presented in this case, where Mother unquestionably met several statutory grounds for termination at the time that her children were removed and even at the time of the last permanency hearing, but presented evidence of substantial improvement by the time of the termination trial.
¶ 92 Of the fault-based grounds enumerated in section 407, only one is couched entirely in the present tense: "that the parent is unfit or incompetent." Utah Code Ann. § 78-3a-407(1)(c) (emphasis added). Thus, a juvenile court's finding that a parent falls within section 407(1)(c) at the time of termination represents a finding that the parent is currently unfit or incompetent. So long as that unfitness or incompetence is of sufficient magnitude to place the parent below the "minimum threshold of fitness" described in In re D.B., termination of the parent's rights may constitutionally proceed. 2002 UT App 314, ¶ 7, 57 P.3d 1102.
¶ 93 Every other enumerated ground in section 407 relies wholly or in part on actions or inactions that have taken place prior to a termination trial. See, e.g., Utah Code Ann. § -407(1)(b) (stating as a ground for termination "that the parent has neglected or abused the minor" (emphasis added)). When a juvenile court relies on one of those grounds, it cannot look merely at whether past events have occurred that place the parent within the plain language of the statute. It must also consider whether the magnitude of the past events, viewed in light of a parent's improvement efforts and other circumstances existing at the time of the termination trial, continues to place the parent below a threshold of fitness such that termination of his or her constitutional rights is permitted. If we were not to read such a requirement into the statute, a parent's single act of neglect or abuse, or other action or inaction meeting the plain language of the statute at any time in the past, would expose the parent to termination of his or her parental rights at any time in the future that it became in the child's best interests to do so. As explained in In re J.P., the best interests of the child standard is insufficiently protective of a parent's fundamental rights to serve as the sole basis for termination. See 648 P.2d 1364, 1374-77 (Utah 1982).
¶ 94 In essence, this is simply a restatement of the In re M.L. standard for evaluating present parental fitness by balancing past and present factors:
[T]he weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent displayed an unwillingness or inability to improve his or her conduct and on any destructive effect the parent's past conduct or the parent's delay in rectifying the conduct has had on the parent's ability to resume a parent-child relationship with the child.
In re M.L., 965 P.2d 551, 561 (Utah Ct.App. 1998). Our decision today clarifies that the same balancing test applies to each of the *254 grounds for termination set out in Utah Code section 78-3a-407, ensuring that termination of a parent's rights is always based on the totality of the presently existing circumstances. See In re M.L., 965 P.2d at 561 (assuming that a court must consider present circumstances even when prior failure of parental adjustment has been established); In re J.N., 960 P.2d 403, 408 n. 8 (Utah Ct.App. 1998) ("Although it may be a difficult feat to accomplish, the parent may still be able to change circumstances such that when the petition is tried, the juvenile court will not find by clear and convincing evidence grounds for terminating parental rights."); A.E. v. Christean, 938 P.2d 811, 816 (Utah Ct.App.1997) (implying that a parent's improvement in situation and behavior, after services are terminated but before a termination trial, may prevent termination of parental rights).
¶ 95 To summarize, a juvenile court must find fault-based grounds for termination before it ever reaches the question of the child's best interests. Utah Code section 78-3a-407 enumerates multiple grounds that will support the termination of parental rights, and the court must find that at least one of these grounds exists pursuant to the plain language of the statute. See Utah Code Ann. § 78-3a-407(1). The court must then consider all of the evidence before it and determine whether, under the totality of the circumstances, the State has established by clear and convincing evidence that the parent falls beneath a minimum threshold of fitness such that his or her parental rights may constitutionally be terminated. In making these determinations, the court must consider past and present circumstances, including the nature and gravity[26] of the parent's actions, the impact of the parent's actions on the parent-child relationship, the effect of any resulting separation on the parent-child relationship, and parental efforts at improvement. Only when the court finds presently existing statutory and constitutional grounds for termination may the court proceed to terminate parental rights.

D. Evidence of Rehabilitation Must Clearly Refute all Grounds for Termination
¶ 96 Often, as in the present case, the State will allege multiple statutory grounds for the termination of a parent's rights. Any one of these grounds, if established by clear and convincing evidence, will support a juvenile court's decision to terminate parental rights. See Utah Code Ann. § 78-3a-407(1) (allowing termination of parental rights based upon any one of the enumerated grounds). When a case presents a legitimate question as to whether a parent's rehabilitative efforts have sufficiently corrected his or her prior shortcomings, the juvenile court and the parties must keep in mind that each statutory ground must be determined individually and that rehabilitation as to one ground is not rehabilitation as to all.
¶ 97 The statutory termination ground that is most amenable to negation by rehabilitation is a parent's unfitness or incompetence. See id. § 78-3a-407(1)(c). As previously discussed, a parent's unfitness or incompetence must be established at the time of the termination trial. Even when focusing on present parenting ability, however, courts have had little difficulty in finding present unfitness based on prior behavior when the evidence does not suggest improvement in fitness or ability since the time of the prior behavior. See In re S.L., 1999 UT App 390, ¶ 33, 995 P.2d 17 (holding that juvenile court's parental unfitness determination was supported by multiple findings of fact and that mother's recent progress did not outweigh her past *255 conduct and its effect on the parent-child relationship); In re M.L., 965 P.2d 551, 562 (Utah Ct.App.1998) (holding that breakdown of parent-child relationship due to mother's drug use and long separation from the child supported finding of present unfitness despite recent improvement efforts).
¶ 98 The other fault-based grounds enumerated in Utah Code section 78-3a-407 focus more directly on past behavior. Such past behavior is often not in dispute, and the State will often be able to show by clear and convincing evidence that a particular statutory ground existed at one time-that a parent did in the past abandon, abuse, or neglect a child, or did fail to comply with a service plan within a reasonable amount of time. The State must also show, however, that the severity of the past conduct and its effect on the parent-child relationship continues to warrant the present termination of parental rights. Only then does the burden shift to the parent to produce evidence rebutting the State's showing of present grounds for termination. See In re J.B., 2002 UT App 267, ¶ 22, 53 P.3d 958.
¶ 99 It is important to remember that evidence tending to negate any particular ground for terminationparticularly evidence aimed at disproving present parental unfitness or incompetencemay have little or no relevance as to any other ground. Further, any evidence of recent improvement may be outweighed by the negative effects of a parent's prior behavior on the parent-child relationship:
Although a parent may be able to overcome the detrimental effect on her child of prior behavior, this will not always be the case. "From the child's perspective, at least, the earlier period of stagnation is not necessarily wiped out by the later improvement. The harm may have been done."
In re M.L., 965 P.2d at 562 (quoting In re B.M., 165 Vt. 331, 682 A.2d 477, 480 (1996)).
¶ 100 The juvenile court must weigh any evidence of recent improvement against the evidence supporting each asserted ground for termination. After doing so, the court may find that a parent's efforts have negated one or more of the State's asserted grounds for termination. However, if the properly weighed evidence continues to adequately support even one of the asserted grounds for termination, then the court may find that the State has established grounds for termination and proceed with the termination analysis despite the parent's efforts.

III. Clearly Erroneous Findings of Fact and Conclusions of Law
¶ 101 We review the termination of Mother's parental rights in this case in light of the requirement that the State establish grounds for termination of parental rights, existing at the time of the termination hearing, by clear and convincing evidence. We conclude that there are multiple factual findings in the Termination Order that are rendered clearly erroneous by Mother's post-permanency hearing efforts to rehabilitate herself. We also conclude that the remaining factual findings are insufficient to establish any of the cited grounds for termination by clear and convincing evidence at the time of the termination hearing. We address each ground for termination, and its supporting factual findings, in turn.

A. Neglect
¶ 102 Utah Code section 78-3a-407 provides that a court may terminate all parental rights with respect to a parent on any one of a number of different legal grounds. See Utah Code Ann. § 78-3a-407(1). The first basis for termination utilized by the juvenile court in this case is found in section 78-3a-407(1)(b), which allows termination of parental rights upon a finding "that the parent has neglected or abused the child." Id. § -407(1)(b).
¶ 103 In this case, the primary allegation of Mother's neglect was her ongoing methamphetamine use. By statute, evidence of drug use can support a finding of neglect in certain circumstances. "In determining whether a parent or parents . . . have neglected a child the court shall consider, but is not limited to, the following circumstances, conduct, or conditions: . . . habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render *256 the parent unable to care for the child. . . ." Id. § -408(2)(c).
¶ 104 The Termination Order determined that Mother had neglected the Children, and contains multiple factual findings in support, including:
[Finding 24:] Each and every one of the [C]hildren's hair tested positive for exposure to methamphetamine.[27] The parent's [sic] drug use obviously had an effect on the [C]hildren. The [c]ourt finds that the [C]hildren have been neglected due to the conduct of their parents [Father] and [Mother].
[Finding 25:] [Mother] has neglected the [C]hildren and is an unfit parent through her habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render her unable to care for the [C]hildren.
Mother admitted to her long-term involvement with methamphetamine prior to the Children's removal from her custody, and to at least intermittent use during the twelve-month reunification period. She does not contest that in the past her drug use was habitual or excessive and rendered her unable to care for the Children. Thus, there is ample support for the proposition that Mother has, in the past, neglected the Children.
¶ 105 However, Mother also presented, and the juvenile court accepted as fact, evidence of substantial rehabilitative efforts occurring after the termination of reunification services but prior to the trial. Mother had maintained sobriety for over five months at the time of trial. She had obtained her commercial driver license through a truck driving school program that required drug testing as a condition of enrollment. She had engaged in individual and group counseling with Weber Human Services with a focus on domestic violence, maintaining sobriety, and mental health counseling. She provided evidence of twenty-five consecutive clean random urinalysis tests that she had undertaken pursuant to that counseling. She began working on a twelve-step recovery program through NA and attended NA meetings at least once a week. She had obtained full-time benefitted employment and obtained housing suitable for herself and the Children. And Mother accomplished all of these things without the assistance of State reunification services, which had been terminated at the permanency hearing.
¶ 106 Despite this evidence, much of which the juvenile court expressly accepted as fact in the Termination Order, the juvenile court concluded in Finding 39 that:
[M]other has failed to meaningfully participate in and/or to complete any substance abuse treatment. She has failed to consistently provide urinalysis samples for testing. She has not completed domestic violence counseling. She has not completed anger management counseling. She has not completed a mental health assessment or any mental health treatment. She has not maintained stable employment or stable housing.
As a statement of Mother's rehabilitative efforts at the time of the termination trial, almost every aspect of this finding is clearly erroneous. Mother had been meaningfully participating in drug treatment, providing clean urine samples, undergoing counseling for violence and mental health issues, and had obtained both housing and full-time employment for the indefinite future.
¶ 107 Neglect, as a ground for termination, cannot be found by looking solely at past behavior. Rather, a juvenile court must balance "the parent's present ability and the likelihood that the parent will be able to resume parenting within a reasonable time" against the "parent's past conduct and its debilitating effect on the parent-child relationship." In re M.L., 965 P.2d 551, 562 (Utah Ct.App.1998). In this case, where Mother's neglect of the Children consisted of her drug use, we determine that the juvenile court gave insufficient weight to the evidence of Mother's rehabilitative efforts.
¶ 108 The juvenile court found:
[Finding 57:] Based on the history of the case and the length of time the parents *257 have been involved with illegal substances, if the court were to return the [C]hildren to the parents, it is likely that within six months or a year, we would be right back where we are now, with the [C]hildren in custody after having been exposed to their parent's [sic] use of methamphetamine.
In light of Mother's substantial efforts at rehabilitation by the time of the termination trial, this finding represents a good deal of speculation on the part of the juvenile court. We are in no better position to foresee the future than the juvenile court, but what Mother has been able to accomplish suggests that she has as good a chance of remaining drug-free as any recovering addict.[28] Accordingly, we determine that the juvenile court's findings represent impermissible speculation under the circumstances of this case. See In re J.J.T., 877 P.2d 161, 167 (Utah Ct.App.1994) (stating, in the context of incarceration and suspicion of criminal behavior, that "suspicion and speculation are not enough to justify terminating parental rights").

B. Unfitness
¶ 109 Utah Code section 78-3a-407(1)(c) allows the termination of parental rights upon a finding "that the parent is unfit or incompetent." Utah Code Ann. § 78-3a-407(1)(c). As in its determination of neglect, the juvenile court considered Mother's drug use and found that it rendered her unable to care for the Children. See id. § -408(2)(c) (stating that the court shall consider habitual or excessive use of drugs that render the parent unable to care for the child in its determination of unfitness or neglect).
¶ 110 The juvenile court, in finding Mother unfit, stated that "[M]other has failed to meaningfully participate in and/or complete any substance abuse treatment" and that "[s]he has failed to consistently provide urinalysis samples for testing." These statements were for the most part true at the time of the permanency hearing; however, Mother made substantial efforts during the approximately four months between the time of the permanency hearing and termination trial. At the permanency hearing, Mother had submitted only two clean urinalysis samples and had participated in a number of drug treatment programs without completing any of them. However, at the time of the termination trial, Mother had made substantial efforts that rendered the juvenile court's conclusions incorrect. The juvenile court failed to adequately weigh Mother's rehabilitative efforts at the time of the termination trial.
¶ 111 At the time of the termination trial, Mother had submitted approximately twenty-five random clean urine samples, actively engaged in outpatient treatment, attended weekly NA meetings, rearranged her work schedule to allow her to attend domestic violence groups, began working on the twelve-step NA program, and formed a support system that included her family and NA sponsor. In addition she had maintained sobriety for over five months, and demonstrated *258 that she had learned to cope with stressful situations, such as Father's relapse, which might have previously caused her to relapse.
¶ 112 Although such evidence of rehabilitation can be outweighed by evidence of deterioration of the parent-child relationship, the juvenile court's findings in this case do not support such a result. The court found that Mother visited with the Children thirty-four times during the twelve-month reunification period, and had another eighteen visits in the four months between the permanency hearing and the termination trial. The court found that the Children enjoyed these visits and noted the guardian ad litem's testimony that the two oldest children desired to return to Mother's custody. Most importantly, the court found that "the [C]hildren have a bond of love and affection with [Mother]."[29]
¶ 113 The juvenile court based its unfitness finding primarily on Mother's previous drug use. Given Mother's sobriety, meaningful participation in outpatient treatment, and active commitment to face her methamphetamine addiction at the time of the termination trial, viewed in light of the ongoing parent-child relationship between Mother and the Children, we cannot say that Mother's previous drug use provided clear and convincing evidence that she was an unfit parent at the time of trial.

C. Failure to Remedy Circumstances of Out-of-Home Placement
¶ 114 Utah Code section 78-3a-407(1)(d) allows the termination of parental rights upon a finding
(i) that the child is being cared for in an out-of-home placement under the supervision of the court or the division; (ii) that the parent has substantially neglected, wilfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement; and (iii) that there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future.
Utah Code Ann. § 78-3a-407(1)(d).
¶ 115 The Children were placed outside of the home because of the parents' substance abuse, lack of stable housing and employment, underlying mental health problems, and domestic violence between the parents. The juvenile court found that Mother had made minimal efforts to adjust her circumstances, conduct, and conditions to make it in the best interest to return the Children to her home after a reasonable length of time, and concluded that Mother had failed to remedy the circumstances that caused the Children to be in out-of-home placement. The juvenile court also found that there was a substantial likelihood that Mother would not be capable of exercising proper and effective parental care in the near future.
¶ 116 This determination was made despite the fact that Mother had substantially remedied the circumstances that caused the out-of-home placement. In particular, Mother had demonstrated over five months of sobriety and had substantially addressed mental health issues including her addiction to methamphetamine by actively committing to outpatient treatment with Richard Tucker, attending domestic violence group counseling, and participating in the twelve-step NA program. In addition, Mother completed a commercial truck driving school, obtained a commercial driver license and steady full-time employment as a driver, and obtained an apartment. Debra Braegger from DCFS testified that the apartment was very clean and once furnished with beds and dressers for the Children it would meet the State's standards.
¶ 117 Considering Mother's sobriety, meaningful participation in outpatient treatment and commitment to address her methamphetamine addiction, and acquisition of full-time benefitted employment and suitable housing at the time of the termination trial, all of which she accomplished without State *259 reunification assistance, the juvenile court erred in finding that Mother had made only minimal efforts to alter the circumstances that caused the Children's out-of-home placement. Likewise, Mother's efforts substantially increased the likelihood that she would be capable of exercising proper and effective parental care in the near future. Indeed, Mother had established a support system[30] and treatment program that appeared to be effective in assisting her in maintaining sobriety and dealing with her addiction.
¶ 118 Although Mother may have been in the beginning stages of her recovery, and neither Mother nor Richard Tucker would predict her ability to maintain sobriety, Mother demonstrated that she had internalized techniques learned from counseling and gained knowledge about her own addiction that allowed her to maintain sobriety during particularly stressful situations. For example, Mother recognized that because Father continued to use drugs she could not maintain a relationship with him, and filed for divorce on August 12, 2005. In addition, Richard Tucker testified that Mother was presently doing very well in her recovery program and that there was no limit on how long she could participate in that program.
¶ 119 Through substantial efforts to correct her circumstances, Mother has established a place for the Children to live and is able to support them financially. Moreover, Mother has demonstrated that she has created a situation for herself that will increase the likelihood of successfully maintaining sobriety. So long as Mother continues to work on her substance abuse issues, and the most recent evidence suggests that she has, we cannot say that there was clear and convincing evidence that she would not be capable of exercising proper and effective parental care in the near future.

D. Failure of Parental Adjustment
¶ 120 Utah Code section 78-3a-407(1)(e) allows the termination of parental rights upon a finding of "failure of parental adjustment, as defined in this chapter." Utah Code Ann. § 78-3a-407(1)(e). Section 78-3a-403(2) defines failure of parental adjustment as meaning
that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the Division of Child and Family Services to return the child to that home.
Id. § -403(2) (2002).
¶ 121 The juvenile court found that Mother had experienced a failure of parental adjustment in that she had been unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of the Children outside of their home, notwithstanding reasonable and appropriate efforts made by the State. We do not agree. As previously discussed Mother has substantially corrected the circumstances that led to the Children's placement outside of their home.
¶ 122 Although Mother had not substantially corrected all of the circumstances during the twelve months that reunification services were provided, she did make corrections in an expeditious manner immediately following the permanency hearing held on April 22, 2005. Mother immediately enrolled in a commercial driver school. Mother began counseling with Richard Tucker on May 23, 2005. She graduated from the driver school and secured full-time benefitted employment as a driver on June 15, 2005. Mother also signed the Children up for benefits and began paying child support. On July 22, 2005, Mother obtained an apartment. Mother also organized a support system designed to help her address the challenges of recovery and single parenting. And, of course, Mother maintained her sobriety and documented that sobriety with multiple clean drug tests.
¶ 123 Considering the unique circumstances of this case, we cannot say that *260 Mother's failure to remedy the circumstances within the twelve-month reunification period establishes Mother's failure of parental adjustment at the time of trial by clear and convincing evidence. Within the approximately four months after the permanency hearing, Mother substantially corrected the circumstances that led to the removal of her Children from her home without the assistance of reunification services. Therefore, we conclude that the court erred in failing to properly consider Mother's efforts and finding that Mother experienced a failure of parental adjustment.

E. Token Efforts
¶ 124 Utah Code section 78-3a-407(1)(f) allows the termination of parental rights upon a finding "that only token efforts have been made by the parent: (i) to support or communicate with the child; (ii) to prevent neglect of the child; (iii) to eliminate the risk of serious physical, mental, or emotional abuse of the child; or (iv) to avoid being an unfit parent." Utah Code Ann. § 78-3a-407(1)(f). For the reasons discussed in examining the other grounds for termination relied upon by the juvenile court, we conclude that Mother's post-permanency hearing efforts to rehabilitate herself constitute more than "token efforts." Id.
¶ 125 Regarding Mother's efforts to support and communicate with the Children, the juvenile court found that Mother visited with the Children thirty-four times over the twelve-month reunification period, at least three months of which she was in in-patient treatment. The court further found that, in the four months between the permanency hearing and the termination trial, Mother had visited the Children eighteen times, or approximately weekly. And although the juvenile court found that "[M]other has not paid a reasonable portion of substitute physical care and maintenance," Mother presented evidence that she began paying child support as soon as she became gainfully employed and was paying the State approximately $325 monthly at the time of the termination trial.
¶ 126 The other three factors enumerated in the token efforts statute involve preventing neglect, eliminating the risk of abuse, and avoiding unfitness. See id. § 78-3a-407(1)(f)(ii)-(iii). The primary issue before the juvenile court as regards these three factors was Mother's methamphetamine use and the resulting dysfunction in her life. As discussed above, Mother undertook substantial efforts to break her methamphetamine addiction while simultaneously obtaining job training, gainful employment, and stable housing, all of which she accomplished after State reunification services had been terminated.
¶ 127 No reasonable finder of fact could have concluded, at the time of the termination hearing, that there was clear and convincing evidence that Mother's efforts to communicate with and support the Children and avoid neglect, abuse, or unfitness were only token efforts.

CONCLUSION AND SUMMARY
¶ 128 We conclude that the juvenile court's failure to adequately weigh Mother's post-permanency hearing rehabilitation efforts resulted in clearly erroneous factual findings about Mother's present and future ability to properly care for the Children. The remaining findings of fact, as they apply to Mother, establish the existence of an ongoing parent-child relationship between Mother and the Children, and fail to support the juvenile court's conclusions of law that grounds for the termination of Mother's parental rights existed at the time of trial.
¶ 129 We reiterate today that permanency hearings are not the appropriate venue for making termination findings in the absence of a petition for termination of parental rights. We also reaffirm the longstanding rule that the State has the burden of proving grounds for termination by clear and convincing evidence. The State's evidence must demonstrate the existence of statutory grounds for termination of parental rights, and that the gravity of a parent's shortcomings is substantial enough to place the parent below the "minimum threshold of fitness" required by the United States and Utah Constitutions at the time of the termination trial. In re D.B., 2002 UT App 314, ¶ 7, 57 P.3d 1102. We also remind practitioners that the *261 various statutory grounds for termination involve differing factual considerations, and rehabilitation as to one may not constitute rehabilitation as to all.
¶ 130 Termination decisions can, and should, be among the most difficult decisions that a court makes. We generally grant a high degree of deference to the juvenile court's factual findings, and this case should not be interpreted as a retreat from that high level of deference. Nevertheless, we are presented here with a parent who, despite her previous substantial shortcomings, managed to accomplish substantial rehabilitation between the permanency hearing and the time of the termination trial. In light of the continuing vitality of the parent-child relationship, we determine that Mother's previous drug use and other prior failings do not outweigh the evidence of present parenting ability accepted as fact by the juvenile court.
¶ 131 We also emphasize that prompt resolution of conditions leading to the removal of a child from the home is the surest way that a parent can avoid the ultimate termination of his or her parental rights. This is the first case in the eight years since In re M.L. that this court has reversed a juvenile court's termination order based on a juvenile court's improper weighing of past and present circumstances. See In re M.L., 965 P.2d 551 (Utah Ct.App.1998). Although today's decision may encourage parents not to give up in their attempts to overcome whatever problems have led to the removal of their children, no one should be under any illusion that last-minute rehabilitative efforts will serve to prevent termination in any particular case.
¶ 132 Mother's post-permanency hearing efforts in this matter, and the results of those efforts, are objectively extraordinary. Mother's efforts, made without the assistance of State reunification services, are particularly impressive when viewed against the facts and circumstances of previous Utah cases in which parents have made a rehabilitation argument. Also unusual in this case is the lack of deterioration in the relationship between Mother and the Children, as found by the juvenile court. It is only the confluence of these factors that results in the decision to reverse the juvenile court's termination order in this case. Other parents whose children have been removed from the home would be well advised to consider Mother's course of action in this casewaiting until services have been terminated to make significant life changesa risky one.
¶ 133 We reverse the juvenile court's termination of Mother's parental rights in the Children and remand this matter for further proceedings consistent with this opinion.
¶ 134 I CONCUR: JUDITH M. BILLINGS, Judge.
¶ 135 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Presiding Judge.
NOTES
[1] The Children were living with Mother and Father prior to their removal. While Father was a party to this action, we limit our factual discussion to Mother unless the context requires otherwise. The fathers of B.R. and J.R. were not parties to this action.
[2] Findings at a permanency hearing generally need only be made by a preponderance of the evidence, while the higher standard of clear and convincing evidence is usually not applicable until the juvenile court is making findings in support of termination of parental rights at a termination trial. See A.E. v. Christean, 938 P.2d 811, 817 (Utah Ct.App.1997).
[3] The juvenile court expressly noted that it made this finding by a preponderance of the evidence. Every other factual finding was made by the higher, and inapplicable, clear and convincing evidence standard.
[4] Utah Code section 78-3a-312(4)(d) requires that reunification services be terminated after twelve months, but provides that "the court may extend reunification services for no more than 90 days if the court finds that: (i) there has been substantial compliance with the child and family plan; (ii) reunification is probable within that 90-day period; and (iii) the extension is in the best interest of the minor." Utah Code Ann. § 78-3a-312(4)(d).
[5] Due to witness availability issues at trial, the parties presented several witnesses out of order. Our description of the trial testimony is ordered for clarity and is not meant to reflect the actual order of testimony at trial.
[6] B.R.'s foster mother testified that she would consider adopting B.R.K.M.'s foster mother testified that she would adopt K.M. Both N.R. and J.R.'s foster mothers stated that they did not intend on adopting.
[7] Mother completed over sixty days inpatient treatment at House of Hope and approximately twenty-eight days inpatient treatment at Women's Recovery Center.
[8] Specific factual findings and legal conclusions from the Termination Order will be discussed in detail in the analysis section of this decision.
[9] As noted in subsequent caselaw, dispositional review hearings are now referred to as permanency hearings. See In re S.K., 1999 UT App 261, ¶ 1 n. 1, 987 P.2d 616 ("[W]hat are now called permanency hearings, see, e.g., Utah Code Ann. § 78-3a-312 (Supp.1997), used to be called dispositional review hearings, see, e.g., Utah Code Ann. § 78-3a-312 (Supp.1995)." (quotations omitted)).
[10] See Utah Code Ann. § 78-3a-311(2)(d)(iii)(A) ("The time period for reunification services may not exceed 12 months from the date that the minor was initially removed from the minor's home.").
[11] that the Utah Supreme Court is reviewing this case on an issue unrelated to the question of parental improvement.
[12] ASFA requires states to hold a permanency hearing within twelve months of the date the child is considered to have entered foster care. See ASFA § 302(2). State agencies are required to file a petition to terminate parental rights when a child has been in foster care for fifteen of the most recent twenty-two months, with certain exceptions. See id. § 103(a)(3)(E).
[13] Concurrent planning is a tool utilized to expedite permanency for children by allowing agencies to provide reunification services while simultaneously making alternative arrangements to place the child permanently if reunification efforts should prove unsuccessful.
[14] Utah law has various timing requirements that further the goal of providing for the safe and timely placement of children. See Utah Code Ann. §§ 78-3a-306(1)(a) (Supp.2006) (requiring a shelter hearing within seventy-two hours excluding weekends and holidays after removal or placement of the child in DCFS protective custody); -307(6)(a)(ii) (Supp.2006) (requiring a hearing no later than twelve months after kinship placement for purpose of entering a permanent order); -308 (Supp.2006) (requiring pretrial and adjudication hearings within fifteen calendar days from the date of a shelter hearing with final adjudication no later than sixty days from the shelter hearing); -310 (2002) (requiring a dispositional hearing no later than thirty days after adjudication hearing); -311(2)(f)(ii) & -311.5 (Supp.2006) (requiring a six-month review hearing, and a permanency hearing no later than twelve months after the original removal of the child); -312(1)(a), (d) (providing that the time period for reunification services shall not exceed twelve months from the date the child was initially removed from the home, but allowing for possibility of a ninety day extension).
[15] The State must file a petition to terminate parental rights unless, at the option of the State, the child is being cared for by a relative, the State has documented in the case plan a compelling reason for determining that filing such a petition would not be in the best interest of the child, or the family has not been provided the services deemed necessary for the safe return of the child to the child's home. See ASFA § 103(E)(i)-(iii).
[16] The study evaluated the impact of placing children from public care into nonrelative adoptive homes, and identified four factors that independently contribute to a higher risk of disruption. See Alan Rushton & Cherilyn Dance, The Adoption of Children from Public Care: A Prospective Study of Outcome in Adolescence, 45:7 J. Am. Acad. Child Adolesc. Psychiatry 877, 881 (2006) (finding that being older at the time of placement, i.e. between five and eleven years old; having a history of preferential rejection by biological parent; having spent longer in care; and having high levels of ongoing behavioral and overactivity problems contributed independently to a higher risk of disruption). The study was conducted for approximately six years and found that a model utilizing the four factors correctly predicted the outcome of placements in over eighty-five percent of the studied cases. See id. at 881-82.
[17] Although court-ordered reunification services are not available to a parent in this situation, see Utah Code Ann. § 78-3a-312(3)(d) (stating that "[t]he court may not extend reunification services beyond 12 months from the date the minor was initially removed from the minor's home, . . . except that the court may extend reunification services for no more than 90 days if the court finds that (i) there has been substantial compliance with the child and family plan. . . ."), resources may nonetheless be available to parents who seek to continue expedited efforts to rehabilitate.

Should a parent successfully petition for restoration of custody, it appears that home-based services are available through DCFS to a child returning home from foster care. When a child receives home-based services, a Child and Family Team is established for the child. The team develops a unified child and family plan that may include counseling with parents and children, parenting education, budgeting and financial help, crisis intervention, connection with other resources, and frequent visits with the family.
[18] Other courts besides the juvenile court may on occasion hear termination proceedings, see Utah Code Ann. § 78-30-4.16(1), (2)(a) (Supp. 2006) (allowing the district court to terminate parental rights in contested adoption cases), and other parties besides the State may petition for termination of a parent's rights, see id. § 78-3a-404(1) (2002) ("Any interested party, including a foster parent, may file a petition for termination of the parent-child relationship with regard to a child."). We refer to the juvenile court and the State throughout this analysis because the facts of this case involve the State petitioning for termination in the juvenile court.
[19] An inference in favor of termination seems even more likely in the present situation, where the juvenile court chose to make termination findings at the permanency hearing despite the issue of termination not being before it. We also note that Mother may have had tactical or other reasons for failing to contest the State's case at the permanency hearing.
[20] As noted earlier, permanency and termination may be addressed together if a petition to terminate parental rights is filed prior to the time of the permanency hearing. See Utah Code Ann. § 78-3a-312(8)(a).
[21] We note some similarity to the criminal law context, where a defendant might opt to remain silent at her preliminary hearing and present all of her evidence for the first time at trial. Obviously, even if the judge presiding at the preliminary hearing were to enter factual findings against the defendant beyond a reasonable doubt, those findings could not be used against the defendant at trial.
[22] Alternately, parents would have to treat every permanency hearing as if it could result in termination findings, potentially turning every permanency hearing into a full-blown trial and preventing cooperative efforts aimed at resolving existing problems.
[23] In re A.F. does suggest that factual findings entered at a permanency hearing may be challenged on appeal only from a subsequent final termination order relying on those findings. See 2006 UT App 200, ¶ 11, 552 Utah Adv. Rep. 55, 138 P.3d 65; see also In re S.A.K., 2003 UT App 87, ¶ 14, 67 P.3d 1037 (reasoning that errors in a juvenile adjudication can be addressed on appeal from the ultimate disposition). While such a bifurcated approach would protect a parent's right to appeal factual findings from the permanency hearing, it would also increase the cost and complexity of the appeals process, as well as potentially lengthen the period of uncertainty for both the child and involved families.
[24] The statute also enumerates two other grounds for termination that are not fault-based: voluntary relinquishment of parental rights and relinquishment of a newborn pursuant to statute. See Utah Code Ann. §§ 78-3a-407(1)(g), -407(1)(i).
[25] At the very least, for example, we must read the term "neglected," Utah Code Ann. § 78-3a-407(1)(b), to mean "substantial[ly] neglect[ed]," In re J.P., 648 P.2d 1364, 1375 (Utah 1982).
[26] Obviously, some acts are so grave that the resulting inference of unfitness may be, at least as a practical matter, insurmountable. Utah law recognizes as much by identifying certain circumstances that constitute "prima facie evidence of unfitness." Utah Code Ann. § 78-3a-408(6) (identifying certain crimes and other serious acts of harm to children as prima facie evidence of unfitness); see also id. § -408(1) (enumerating circumstances constituting prima facie evidence of parental abandonment). Nevertheless, the Legislature's use of the term prima facie indicates that the inference of unfitness is not irrebuttable as a matter of law. See In re M.L., 965 P.2d 551, 557 (Utah Ct.App.1998) ("`A prima facie case is proven when evidence has been introduced which, in the absence of contrary evidence, would entitle the party with the burden of proof to judgment as a matter of law.'" (citation omitted)).
[27] These tests were apparently conducted shortly after the Children were removed from the home. In any event, the Children had not been in Mother's custody for approximately fifteen months at the time of the termination trial.
[28] Mother's drug rehabilitation was the primary goal outlined in her reunification service plan. The court found that she had not successfully rehabilitated or meaningfully participated in treatment because she had not completed any of the substance abuse treatment programs outlined in her service plan. Although Mother had not completed any of the drug programs recommended by the State or the court, she had succeeded in maintaining sobriety for over five months and had found a rehabilitation program that appears to be working for her. Successful rehabilitation is not signified by the completion of any given program. Rather, it is the lifestyle changes, continued sobriety, and internalization and application of techniques learned from those programs that demonstrate successful rehabilitation. Juvenile courts should avoid overlooking the rehabilitation accomplishments made by an individual merely because that person does not complete, with perfection, the specific programs outlined in the service plan. Likewise, juvenile courts should understand that the rehabilitation process is often plagued with relapses, and treatment plans may have to be adjusted to meet the specific needs of the individual.

Furthermore, rehabilitation is a life long process in which no individual recovering drug abuser or counselor can accurately predict future success. Indeed, one of the realizations that a recovering drug abuser needs to achieve is the understanding that, each and every day, they will have to make a decision to maintain sobriety. Therefore, juvenile courts should understand that a recovering drug abuser or counselor's refusal to predict future success does not necessarily denote the likelihood of failure or lack of commitment to rehabilitation. To the contrary, such testimony may indicate an honest and realistic approach to rehabilitation.
[29] Evidence of deterioration of the parent-child relationship is relevant to each of the grounds for termination presented in this appeal. See In re M.L., 965 P.2d 551, 561-62 (Utah Ct.App.1998). However, as the juvenile court's findings in this case indicate minimal deterioration in the parent-child relationship, we do not expressly address the parent-child relationship in each section of our analysis.
[30] Mother testified that her support system consisted of family members, her pastor, and her NA sponsor and fellow NA members, all of whom had offered their assistance to Mother in her sobriety efforts.